## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| BFG Corporation d/b/a Byline Financial Group | ) | |
| | ) | Case No.: _____ |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| J&E Business Consulting LLC d/b/a J&E Media | ) | |
| Corp; and Paul Paredes a/k/a Paul Paredes Sr. | ) | |
| a/k/a Paul Donoso a/k/a Paul Paredes Donoso | ) | |
| a/k/a Paul Paredes Donoso Sr. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

**NOW COMES** BFG Corporation d/b/a Byline Financial Group ("Plaintiff"), by and through its

attorneys, Ashen Law Group, complaining of J&E Business Consulting LLC d/b/a J&E Media Corp

("J&E") and Paul Paredes a/k/a Paul Paredes Sr. a/k/a Paul Donoso a/k/a Paul Paredes Donoso

a/k/a Paul Paredes Donoso Sr. ("Paredes") (collectively, "Defendants"), and in support thereof states

as follows:

### PARTIES

1. Plaintiff is an Illinois corporation with its principal place of business in Lake County, Illinois. Plaintiff is an equipment finance company.

2. J&E is a New York limited liability company. At all times relevant, all members of J&E were citizens of the state of New York. At all times relevant, J&E maintained its principal place of business in Rochester, New York.

3. J&E provides merchant services for small businesses, including but not limited to credit and debit card payment processing services for retail merchants. As part of this service, J&E would broker

1

or sell point-of-sale hardware and software commonly referred to as "POS Systems" to its customers.

4. Paredes is a citizen of the state of New York. At all times relevant, Paredes was a member and manager of J&E. At all times relevant, Paredes acted as an agent of J&E.

## JURISDICTION AND VENUE

5. This Court has original subject matter jurisdiction in the above-captioned case pursuant to 28 U.S.C. §1332(a) because the matter in controversy is between citizens of different states and the damages claimed exceed the sum of $75,000.00, exclusive of interests and costs.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## SUMMARYT OF FACTS APPLICABLE TO ALL COUNTS

7. This matter stems from Paredes' artifice and scheme to fraudulently induce Plaintiff, an equipment finance company, to make five separate equipment loans to five separate businesses ("Borrowers") in June-July 2023.

8. Fraudulent inducement is a form of common-law fraud. *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 17, 653 N.E.2d 968, 972 (1995). Under Illinois law, fraudulent inducement requires proof of five elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. See *Hoseman v. Weinschneider*, 322 F.3d 468 (7th Cir. 2003) citing *Phil Dressler & Associates, Inc. v. Old Oak Brook Inv. Corp.*, 192 Ill. App. 3d 577, 584, 548 N.E.2d 1343, 1347 (1989).

9. For each of the five loan agreements described herein, Paredes applied Borrowers for, and entered Borrowers into the loan agreements with Plaintiff without the Borrowers' knowledge or permission. Each loan agreement was secured by a personal guaranty purported to be signed by one of the

Borrowers' principals ("Guarantors"). (Guarantors and Borrowers are collectively referred to herein as "Debtors").

10. Paredes used the Debtors' sensitive identifying information and posed as the Debtors throughout the application process, in order to lead Plaintiff to believe the Debtors were applying for third-party financing through Plaintiff for the purchase of a POS System ("Equipment") from J&E.

11. In reality, Debtors themselves never applied for the subject loans. Rather, Paredes would complete the loan applications in the Debtors' names using Debtors' identifying information.

12. Paredes was in possession of Debtors' identifying information because Debtors were current or former customers of J&E, and thus Paredes had access to Debtor's banking information and accounts from having provided merchant services to the Debtors.

13. Once the loans were approved by Plaintiff, Paredes forged the Debtors' signatures on the equipment financing agreements and personal guaranties.

14. For each of the five loans, Plaintiff made verification phone calls to the Borrower. In each call, the "Borrower" a) confirmed that the Equipment had been delivered by J&E and accepted by Borrower; b) understood the general terms of the loan; c) understood that Plaintiff would be paying J&E for the Equipment; d) that the equipment financing agreement would then commence.

15. In order to communicate with Plaintiff, ostensibly as the Debtors during the course of applying for the loan and thereafter, Paredes would either create alternative email addresses and phone numbers for the Debtors, or intercept Plaintiff's communications to the Debtors to their actual email addresses and or phone numbers which Paredes had access to.

16. Paredes would tender Plaintiff the initial payment in the form of ACH transfer from Debtors' bank accounts, or in the form of a check from the Borrower's business accounts.

17. Plaintiff would then transfer the loan proceeds to J&E, as "vendor" of the Equipment.

18. For each fraudulent transaction described herein, Paredes knew that the documents it submitted to Plaintiff in applying for the loan had not been authorized by the Debtor to be submitted to Plaintiff for the purpose of having the Debtor to into a contract with Plaintiff. Paredes knew the Debtor did not request or purchase the Equipment from J&E.

19. Paredes made such misrepresentations because their fraudulent artifice and scheme required a loan applicant (i.e., a Debtor for Plaintiff to issue a loan), the proceeds of which would be payable to J&E, as "vendor" of the Equipment.

20. Whether Debtors themselves knowingly and voluntarily applied for and entered into the loans was a material term of the contracts at issue in this action. Had Plaintiff known Paredes unlawfully used the identities and business details of J&E's existing or former customers to apply for equipment finance loans from Plaintiff in those Debtors' names and without Debtors' knowledge and or permission, Plaintiff would not have issued the loans set forth herein, and thus never would have transferred the loan proceeds to J&E.

21. Plaintiff justifiably relied on Paredes' material misrepresentations and false statements in issuing the five loans at issue in this action.

22. After the equipment finance agreements were signed, the Debtors eventually defaulted under the agreements and personal guaranties for failing to make payment. In some cases, loan payments were made by Paredes, without Borrower's knowledge or permission. Upon information and belief, either Paredes tendered payment to Plaintiff with monies using proceeds from other loans to make it appear as though Debtors were performing under the loans or misrepresented to Debtors the purpose of the payment made to Plaintiff.

23. Plaintiff is not the only victim of Paredes' fraud. In October 2023, Paredes was arrested by agents from the Federal Bureau of Investigation and charged with counts of wire fraud, money laundering, and aggravated identity theft. The criminal complaint alleges Paredes perpetuated the same or similar

4

fraud against equipment finance companies other than Plaintiff. The criminal case against Paredes remains pending in the United States District Court for the Western District of New York under case number 6:23-mj-00633-MJP-1.

### COUNT I - FRAUD
### Katsuo Grill & Sushi Inc. Transaction

24. Plaintiff re-alleges and reincorporates all of the preceding paragraphs as fully set forth herein as Paragraph 24.

25. In June 2023, Paredes, acting as an agent of J&E, contacted Plaintiff about a potential equipment loan to Katsuo Grill & Sushi Inc., a California corporation ("Katsuo") for Katsuo's purchase of a POS System from J&E.

26. To induce Plaintiff to approve the subject loan to Katsuo, Paredes provided Plaintiff with a completed credit application supposedly completed and signed by Katsuo's principal, Kwong Tsang. The completed application included certain identity information of Katsuo and Tsang, including but not limited to a) Katsuo's federal employer identification number, b) Tsang's social security number and c) a copy of Tsang's driver's license.

27. To induce Plaintiff to approve the subject loan to Katsuo, Paredes fraudulently represented that Tsang completed the credit application on behalf of Katsuo. In reality, Paredes completed the credit application without Tsang's permission or knowledge, and forged Tsang's signature on the application.

28. Paredes provided Plaintiff an invoice from J&E to Katsuo for Katsuo's supposed purchase of a POS System more specifically described therein ("Equipment-1"). A true and correct copy of the invoice is attached hereto as **Exhibit 1**.

29. Once Plaintiff approved the loan, Paredes then requested Plaintiff prepare the necessary loan documents to be signed by Katsuo and Tsang for Plaintiff's financing of Equipment-1. Plaintiff prepared the loan documents.

30. On June 20, 2023, Paredes forged the signatures of Tsang on Equipment Finance Agreement No. 78530, the corresponding Personal Guaranty of Tsang, and the Delivery and Acceptance Certificate confirming that Equipment-1 was delivered, inspected, and irrevocably accepted by Katsuo (collectively, "Agreement-1"). A true and correct copy of Agreement-1 is attached hereto as **Exhibit 2**.

31. On June 26, 2023, upon receiving the executed copies of Agreement-1, Plaintiff spoke to an individual over the phone who identified themself as Tsang. The individual a) confirmed that Equipment-1 had been delivered by J&E and accepted by Katsuo; b) understood the general terms of Agreement-1; c) understood that Plaintiff would be paying J&E for Equipment-1; d) that Agreement-1 would then commence.

32. Upon information and belief, the individual Plaintiff spoke to on the phone was not Tsang, but rather Paredes, or an agent of Paredes, who was posing as Tsang, in an effort to deceive Plaintiff into believing Tsang was aware of and agreed to Agreement-1, and that Equipment-1 had been accepted by Katsuo.

33. Thereafter, Paredes issued a check from Katsuo to Plaintiff from Katsuo's checking account, which Paredes had access to, without Katsuo's knowledge about what the payment was for, in the amount of $6,072.90.

34. Thereafter, Plaintiff transferred proceeds in the amount of $59,238 to J&E representing the purported cost of Equipment-1 as represented in the fraudulent invoice, and the parties thereby closed on the transaction.

35. Katsuo and Tsang failed to make the first monthly payment due to Plaintiff under Agreement-1.

36. When subsequently contacted by Plaintiff, Tsang denied having knowledge of Agreement-1, denied signing Agreement-1, denied ever having heard of Plaintiff, and stated he believed the transaction to be fraudulent.

37. Paredes abused his position of trust with Katsuo and Tsang, as his former customers, and used the sensitive identity information of Katsuo and Tsang to steal their identity and impersonate them in applying for Agreement-1 with Plaintiff.

38. In conjunction with the issuance of the Agreement-1, from approximately June 20, 2023 to June 27, 2023, Paredes made a series of false statements of material fact to Plaintiff including but not limited to the following: 1) that Katsuo was purchasing Equipment-1 from J&E; 2) that Equipment-1 was delivered to Katsuo; 3) that Tsang signed Agreement-1 when in actuality Paredes forged Tsang's signatures to make it appear as though Katsuo and Tsang entered into Agreement-1 with Plaintiff; 4) that Katsuo knowingly and willingly made the initial payment under Agreement-1 to Plaintiff (i.e., Paredes presented a forged check to Plaintiff); and 5) that Tsang stated Equipment-1 had been delivered and accepted, and that he understood the terms of Agreement-1 and that it would be commencing (in actuality Paredes or agents of Paredes impersonated Tsang).

39. Paredes, and or the agents of Paredes, knew such false statements of material fact were false at the time they were made to Plaintiff. Or, alternatively, these statements were made reckless disregard of the truth or falsity of the information conveyed.

40. Paredes, and or the agents of Paredes, knew the aforementioned false statements of material fact were indeed false, but made them in order to induce Plaintiff into entering Agreement-1 and issuing funds for the cost of Equipment-1 to J&E.

41. Plaintiff did in fact justifiably rely on those false statements of material fact by issuing Agreement-1 to Katsuo and disbursing funds to J&E accordingly.

42. As a result of Paredes' false statements of material fact made in connection with Agreement-1, Plaintiff has suffered monetary damages in excess of $53,314.10.

43. As Paredes fraudulent inducement of Plaintiff occurred in the course of his employment with J&E, J&E is vicariously liable for this tortious act committed by Paredes.

**WHEREFORE**, Plaintiff BFG Corporation d/b/a Byline Financial Group respectfully requests that the Court enter a judgment in favor of BFG Corporation d/b/a Byline Financial Group and against Defendants, J&E Business Consulting LLC d/b/a J&E Media Corp and Paul Paredes a/k/a Paul Paredes Sr. a/k/a Paul Donoso a/k/a Paul Paredes Donoso a/k/a Paul Paredes Donoso Sr., jointly and severally, and awarding BFG Corporation d/b/a Byline Financial Group i) compensatory and consequential damages in an amount to be determined at trial, but in any event not less than $53,314.10; ii) reasonable attorneys' fees, costs, expenses, and disbursements as otherwise permitted under the law; and iii) any such other and further relief as the Court deems just, reasonable, or equitable.

## COUNT II-FRAUD
### Rhino's Pizzeria, Inc. Transaction

44. Plaintiff re-alleges and reincorporates all of the preceding paragraphs as fully set forth herein as Paragraph 44.

45. In June 2023, Paredes, acting as an agent of J&E, contacted Plaintiff about a potential equipment loan to Rhino's Pizzeria, Inc., a New York corporation ("Rhino") for Rhino's purchase of a POS System from J&E.

46. To induce Plaintiff to approve the subject loan to Rhino, Paredes provided Plaintiff with a completed credit application supposedly completed and signed by Rhino's principal, Tracy Malloy ("Malloy"). The completed application included certain identity information of Rhino and Malloy, including but not limited to a) Rhino's federal employer identification number, b) Malloy's social security number c) a copy of Malloy's driver's license.

47. To induce Plaintiff to approve the subject loan to Rhino, Paredes fraudulently represented that Malloy completed the credit application on behalf of Rhino. In reality, Paredes completed the credit application without Malloy's permission or knowledge, and forged Malloy's signature on the application.

48. Paredes provided Plaintiff an invoice from J&E to Rhino for Rhino's supposed purchase of a POS System more specifically described therein ("Equipment-2") . A true and correct copy of the invoice is attached hereto as **Exhibit 3**.

49. Once Plaintiff approved the loan, Paredes then requested Plaintiff prepare the necessary loan documents to be signed by Rhino and Malloy for Plaintiff's financing of Equipment-2. Plaintiff prepared the loan documents.

50. On June 20, 2023, Paredes forged the signatures of Malloy on Equipment Finance Agreement No. 78676, the corresponding Personal Guaranty of Malloy, and the Delivery and Acceptance Certificate confirming that Equipment-2 was delivered, inspected, and irrevocably accepted by Rhino (collectively, "Agreement-2"). A true and correct copy of Agreement-2 is attached hereto as **Exhibit 4**.

51. On June 26, 2023, upon receiving the executed copies of Agreement-2, Plaintiff spoke to an individual over the phone who identified themself as Malloy. The individual a) confirmed that Equipment-2 had been delivered by J&E and accepted by Rhino; b) understood the general terms of Agreement-2; c) understood that Plaintiff would be paying J&E for Equipment-2; d) that Agreement-2 would then commence.

52. Upon information and belief, the individual Plaintiff spoke to on the phone was not Malloy, but rather Paredes, or an agent of Paredes, who was posing as Malloy in an effort to deceive Plaintiff into believing Malloy was aware of and agreed to Agreement-2, and that Equipment-2 had been accepted by Rhino.

53. Thereafter, Paredes provided Plaintiff a copy of a canceled check from Rhino's business checking account, and a completed authorization form for automatic clearing house ("ACH") allowing for Plaintiff to debit the initial payment due under Agreement-2 in the amount of $1,164.76, and

thereafter, monthly payments on their due date. Paredes forged Malloy's signature on the ACH form without actual authority or knowledge from Malloy or any employee of Rhino.

54. Thereafter, Plaintiff transferred proceeds in the amount of $40,937.04 to J&E representing the purported cost of Equipment-2 as represented in the fraudulent invoice, and the parties thereby closed on the transaction.

55. On August 1, 2023, Plaintiff debited the first monthly payment due under Agreement-2.

56. Malloy subsequently contacted Plaintiff and denied having knowledge of Agreement-2, denied signing Agreement-2, denied ever having heard of Plaintiff, and stated she believed the transaction to be fraudulent.

57. Paredes abused his position of trust with Rhino and Malloy, as his former customers, and used the sensitive identity information of Rhino and Malloy to steal their identity and impersonate them in applying for Agreement-2 with Plaintiff.

58. In conjunction with the issuance of the Agreement-2, from approximately June 20, 2023 to June 27, 2023, Paredes made a series of false statements of material facts to Plaintiff including but not limited to the following: 1) that Rhino was purchasing Equipment-2 from J&E; 2) that Equipment-2 was delivered to Rhino; 3) that Malloy signed Agreement-2 when in actuality Paredes forged Malloy's signatures to make it appear as though Rhino and Malloy entered into Agreement-2 with Plaintiff; 4) that Rhino knowingly and willingly made the initial payment under Agreement-2 to Plaintiff (i.e., Paredes completed the ACH authorization form without Malloy's knowledge); and 5) that Malloy stated Equipment-2 wad delivered and accepted, and that she understood the terms of Agreement-2 and that it would be commencing (in actuality Paredes or agents of Paredes impersonated Malloy).

59. Paredes, and or the agents of Paredes, knew such false statements of material fact were false at the time they were made to Plaintiff. Or, alternatively, these statements were made reckless disregard of the truth or falsity of the information conveyed.

60. Paredes, and or the agents of Paredes, knew the aforementioned false statements of material fact were indeed false, but made them in order to induce Plaintiff into entering Agreement-2 and issuing funds for the cost of Equipment-2 to J&E.

61. Plaintiff did in fact justifiably rely on those false statements of material fact by issuing Agreement-2 to Rhino and disbursing funds to J&E accordingly.

62. As a result of Paredes' false statements of material fact made in connection with Agreement-2, Plaintiff has suffered monetary damages in excess of $38,905.52.

63. As Paredes fraudulent inducement of Plaintiff occurred in the course of his employment with J&E, J&E is vicariously liable for this tortious act committed by Paredes.

**WHEREFORE**, Plaintiff BFG Corporation d/b/a Byline Financial Group respectfully requests that the Court enter a judgment in favor of BFG Corporation d/b/a Byline Financial Group and against Defendants, J&E Business Consulting LLC d/b/a J&E Media Corp and Paul Paredes a/k/a Paul Paredes Sr. a/k/a Paul Donoso a/k/a Paul Paredes Donoso a/k/a Paul Paredes Donoso Sr., jointly and severally, and awarding BFG Corporation d/b/a Byline Financial Group i) compensatory and consequential damages in an amount to be determined at trial, but in any event not less than $38,905.52; ii) reasonable attorneys' fees, costs, expenses, and disbursements as otherwise permitted under the law; and iii) any such other and further relief as the Court deems just, reasonable, or equitable.

## COUNT III - FRAUD
### Ken's Pizza Corner, LLC Transaction

64. Plaintiff re-alleges and reincorporates all of the preceding paragraphs as fully set forth herein as Paragraph 64.

65. In June 2023, Paredes, acting as an agent of J&E, contacted Plaintiff about a potential equipment loan to Ken's Pizza Corner, LLC, a New York limited liability company ("KPC") for KPC's purchase of a POS System from J&E.

66. To induce Plaintiff to approve the subject loan to KPC, Paredes provided Plaintiff with a completed credit application supposedly completed and signed by KPC's principal, Kenneth Flagg ("Flagg"). The completed application included certain identity information of KPC and Flagg, including but not limited to a) KPC's federal employer identification number, b) Flagg's social security number c) a copy of Flagg's driver's license.

67. To induce Plaintiff to approve the subject loan to KPC, Paredes fraudulently represented that Flagg completed the credit application on behalf of KPC. In reality, Paredes completed the credit application without Flagg's permission or knowledge, and forged Flagg's signature on the application.

68. Paredes provided Plaintiff an invoice from J&E to KPC for KPC's supposed purchase of a POS System more specifically described therein ("Equipment-3"). A true and correct copy of the invoice is attached hereto as **Exhibit 5**.

69. Once Plaintiff approved the loan, Paredes then requested Plaintiff prepare the necessary loan documents to be signed by KPC and Flagg for Plaintiff's financing of Equipment-3. Plaintiff prepared the loan documents.

70. On June 22, 2023, Paredes forged the signatures of Flagg on Equipment Finance Agreement No. 78938, the corresponding Personal Guaranty of Flagg, and the Delivery and Acceptance Certificate confirming that Equipment-3 was delivered, inspected, and irrevocably accepted by KPC (collectively, "Agreement-3"). A true and correct copy of Agreement-3 is attached hereto as **Exhibit 6**.

71. On June 26, 2023, upon receiving the executed copies of Agreement-3, Plaintiff spoke to an individual over the phone who identified themself as Flagg. The individual a) confirmed that Equipment-3 had been delivered by J&E and accepted by KPC; b) understood the general terms of Agreement-3; c) understood that Plaintiff would be paying J&E for Equipment-3; d) that Agreement-3 would then commence.

72. Upon information and belief, the individual Plaintiff spoke to on the phone was not Flagg, but rather Paredes, or an agent of Paredes, who was posing as Flagg in an effort to deceive Plaintiff into believing Flagg was aware of and agreed to Agreement-3, and that Equipment-3 had been accepted by KPC.

73. Thereafter, Paredes provided Plaintiff a copy of a canceled check from Rhino's business checking account, and a completed authorization form for automatic clearing house ("ACH") allowing for Plaintiff to debit the initial payment due under Agreement-3 in the amount of $1,198.88, and thereafter, monthly payments on their due date. Paredes forged Flagg's signature on the ACH form without actual authority or knowledge from Flagg or any employee of KPC.

74. Thereafter, Plaintiff transferred proceeds in the amount of $42,120.00 to J&E representing the purported cost of Equipment-3 as represented in the fraudulent invoice, and the parties thereby closed on the transaction.

75. Flagg subsequently contacted Plaintiff and denied having knowledge of Agreement-3, denied signing Agreement-3, denied ever having heard of Plaintiff, and stated she believed the transaction to be fraudulent.

76. Paredes abused his position of trust with KPC and Flagg, as his former customers, and used the sensitive identity information of KPC and Flagg to steal their identity and impersonate them in applying for Agreement-3 with Plaintiff.

77. Here, in conjunction with the issuance of the Agreement-3, from approximately June 29, 2023 to July 7, 2023, Paredes made a series of false statements of material fact to Plaintiff including but not limited to the following: 1) that KPC was purchasing Equipment-3 from J&E; 2) that Equipment-3 was delivered to KPC; 3) that Flagg signed Agreement-3 when in actuality Paredes forged Flagg's signatures to make it appear as though KPC and Flagg entered into Agreement-3 with Plaintiff; 4) that KPC knowingly and willingly made the initial payment under Agreement-3 to Plaintiff (i.e., Paredes completed the ACH authorization form without Flagg's knowledge); and 5) that Flagg stated Equipment-3 had been delivered and accepted, and that he understood the terms of Agreement-3 and that it would be commencing (in actuality Paredes or agents of Paredes impersonated Flagg).

78. Paredes, and or the agents of Paredes, knew such false statements of material fact were false at the time they were made to Plaintiff. Or, alternatively, these statements were made reckless disregard of the truth or falsity of the information conveyed.

79. Paredes, and or the agents of Paredes, knew the aforementioned false statements of material fact were indeed false, but made them in order to induce Plaintiff into entering Agreement-3 and issuing funds for the cost of Equipment-3 to J&E.

80. Plaintiff did in fact justifiably rely on those false statements of material fact by issuing Agreement-3 to KPC and disbursing funds to J&E accordingly.

81. As a result of Paredes' false statements of material fact made in connection with Agreement-3, Plaintiff has suffered monetary damages in excess of $41,070.12.

**WHEREFORE**, Plaintiff BFG Corporation d/b/a Byline Financial Group respectfully requests that the Court enter a judgment in favor of BFG Corporation d/b/a Byline Financial Group and against Defendants, J&E Business Consulting LLC d/b/a J&E Media Corp and Paul Paredes a/k/a Paul Paredes Sr. a/k/a Paul Donoso a/k/a Paul Paredes Donoso a/k/a Paul Paredes Donoso

Sr., jointly and severally, and awarding BFG Corporation d/b/a Byline Financial Group i) compensatory and consequential damages in an amount to be determined at trial, but in any event not less than $41,070.12; ii) reasonable attorneys' fees, costs, expenses, and disbursements as otherwise permitted under the law; and iii) any such other and further relief as the Court deems just, reasonable, or equitable.

### COUNT IV – FRAUD
### Nick's Imports Inc. Transaction

82. Plaintiff re-alleges and reincorporates all of the preceding paragraphs as fully set forth herein as Paragraph 82.

83. In July 2023, Paredes, acting as an agent of J&E, contacted Plaintiff about a potential equipment loan to Nick's Imports, Inc, a New York corporation ("Nick's Import") for Nick's Import's purchase of a POS System from J&E.

84. To induce Plaintiff to approve the subject loan to Nick's Import, Paredes provided Plaintiff with a completed credit application supposedly completed and signed by Nick's Import's principal, Nicolo Bellone ("Bellone"). The completed application included certain identity information of Nick's Import and Bellone, including but not limited to a) Nick's Import's federal employer identification number, b) Bellone's social security number c) a copy of Bellone's driver's license.

85. To induce Plaintiff to approve the subject loan to Nick's Import, Paredes fraudulently represented that Bellone completed the credit application on behalf of Nick's Import. In reality, Paredes completed the credit application without Bellone's permission or knowledge, and forged Bellone's signature on the application.

86. Paredes provided Plaintiff an invoice from J&E to Nick's Import for Nick's Import's supposed purchase of a POS System more specifically described therein ("Equipment-4"). A true and correct copy of the invoice is attached hereto as **Exhibit 7**.

87. Once Plaintiff approved the loan, Paredes then requested Plaintiff prepare the necessary loan documents to be signed by Nick's Import and Bellone for Plaintiff's financing of Equipment-4. Plaintiff prepared the loan documents.

88. On July 14, 2023, Paredes forged the signatures of Bellone on Equipment Finance Agreement No. 79247, the corresponding Personal Guaranty of Bellone, and the Delivery and Acceptance Certificate confirming that Equipment-4 was delivered, inspected, and irrevocably accepted by Nick's Import (collectively, "Agreement-4"). A true and correct copy of Agreement-4 is attached hereto as **Exhibit 8**.

89. On July 17, 2023, upon receiving the executed copies of Agreement-4, Plaintiff spoke to an individual over the phone who identified themself as Bellone. The individual a) confirmed that Equipment-4 had been delivered by J&E and accepted by Nick's Import; b) understood the general terms of Agreement-4; c) understood that Plaintiff would be paying J&E for Equipment-4; d) that Agreement-4 would then commence.

90. Upon information and belief, the individual Plaintiff spoke to on the phone was not Bellone, but rather Paredes, or an agent of Paredes, who was posing as Bellone in an effort to deceive Plaintiff into believing Bellone was aware of and agreed to Agreement-4, and that Equipment-4 had been accepted by Nick's Import.

91. Thereafter, Paredes provided Plaintiff a copy of a canceled check from Rhino's business checking account, and a completed authorization form for automatic clearing house ("ACH") allowing for Plaintiff to debit the initial payment due under Agreement-4 in the amount of $1,198.88, and thereafter, monthly payments on their due date. Paredes forged Bellone's signature on the ACH form without actual authority or knowledge from Bellone or any employee of Nick's Import.

92. Thereafter, Plaintiff transferred proceeds in the amount of $42,120.00 to J&E representing the purported cost of Equipment-4 as represented in the fraudulent invoice, and the parties thereby closed on the transaction.

93. Bellone subsequently contacted Plaintiff and denied having knowledge of Agreement-4, denied signing Agreement-4, denied ever having heard of Plaintiff, and stated she believed the transaction to be fraudulent.

94. Paredes abused his position of trust with Nick's Import and Bellone, as his former customers, and used the sensitive identity information of Nick's Import and Bellone to steal their identity and impersonate them in applying for Agreement-4 with Plaintiff.

95. Here, in conjunction with the issuance of the Agreement-4, from approximately July 10, 2023 to July 17, 2023, Paredes made a series of false statements of material fact to Plaintiff including but not limited to the following: 1) that Nick's Import was purchasing Equipment-4 from J&E; 2) Equipment-4 was delivered to Nick's Import; 3) that Bellone signed Agreement-4 when in actuality Paredes forged Bellone's signatures to make it appear as though Nick's Import and Bellone entered into Agreement-4 with Plaintiff; 4) that Nick's Import knowingly and willingly made the initial payment under Agreement-4 to Plaintiff (i.e., Paredes completed the ACH authorization form without Bellone's knowledge); and 5) that Bellone stated Equipment-4 was delivered and accepted, and that he understood the terms of Agreement-4 and that it would be commencing (in actuality Paredes or agents of Paredes impersonated Bellone).

96. Paredes, and or the agents of Paredes, knew such false statements of material fact were false at the time they were made to Plaintiff. Or, alternatively, these statements were made reckless disregard of the truth or falsity of the information conveyed.

97. Paredes, and or the agents of Paredes, knew the aforementioned false statements of material fact were indeed false, but made them in order to induce Plaintiff into entering Agreement-4 and issuing funds for the cost of Equipment-4 to J&E.

98. Plaintiff did in fact rely on those false statements of material fact by issuing Agreement-4 to Nick's Import and disbursing funds to J&E accordingly.

99. As a result of Paredes' false statements of material fact made in connection with Agreement-4, Plaintiff has suffered monetary damages in excess of $41,084.27.

100. As Paredes fraudulent inducement of Plaintiff occurred in the course of his employment with J&E, J&E is vicariously liable for this tortious act committed by Paredes.

WHEREFORE, Plaintiff BFG Corporation d/b/a Byline Financial Group respectfully requests that the Court enter a judgment in favor of BFG Corporation d/b/a Byline Financial Group and against Defendants, J&E Business Consulting LLC d/b/a J&E Media Corp and Paul Paredes a/k/a Paul Paredes Sr. a/k/a Paul Donoso a/k/a Paul Paredes Donoso a/k/a Paul Paredes Donoso Sr., jointly and severally, and awarding BFG Corporation d/b/a Byline Financial Group i) compensatory and consequential damages in an amount to be determined at trial, but in any event not less than $41,084.27; ii) reasonable attorneys' fees, costs, expenses, and disbursements as otherwise permitted under the law; and iii) any such other and further relief as the Court deems just, reasonable, or equitable.

## COUNT V – FRAUD
### Deveaux Plaza Inc. Transaction

101. Plaintiff re-alleges and reincorporates all of the preceding paragraphs as fully set forth herein as Paragraph 101.

102. In July 2023, Paredes, acting as an agent of J&E, contacted Plaintiff about a potential equipment loan to Deveaux Plaza Inc, a New York corporation ("Deveaux") for Deveaux's purchase of a POS System from J&E.

103. To induce Plaintiff to approve the subject loan to Deveaux, Paredes provided Plaintiff with a completed credit application supposedly completed and signed by Deveaux's principal, Mohamed Muthana ("Muthana"). The completed application included certain identity information of Deveaux and Muthana, including but not limited to a) Deveaux's federal employer identification number, b) Muthana's social security number c) a copy of Muthana's driver's license.

104. To induce Plaintiff to approve the subject loan to Deveaux, Paredes fraudulently represented that Muthana completed the credit application on behalf of Deveaux. In reality, Paredes completed the credit application without Muthana's permission or knowledge, and forged Muthana's signature on the application.

105. Paredes provided Plaintiff an invoice from J&E to Deveaux for Deveaux's supposed purchase of a POS System more specifically described therein ("Equipment-5"). A true and correct copy of the invoice is attached hereto as **Exhibit 9**.

106. Once Plaintiff approved the loan, Paredes then requested Plaintiff prepare the necessary loan documents to be signed by Deveaux and Muthana for Plaintiff's financing of Equipment-5. Plaintiff prepared the loan documents.

107. On July 14, 2023, Paredes forged the signatures of Muthana on Equipment Finance Agreement No. 79247, the corresponding Personal Guaranty of Muthana, and the Delivery and Acceptance Certificate confirming that Equipment-5 was delivered, inspected, and irrevocably accepted by Deveaux (collectively, "Agreement-5"). A true and correct copy of Agreement-5 is attached hereto as **Exhibit 10**.

108. On July 17, 2023, upon receiving the executed copies of Agreement-5, Plaintiff spoke to an individual over the phone who identified themself as Muthana. The individual a) confirmed that Equipment-5 had been delivered by J&E and accepted by Deveaux; b) understood the general

terms of Agreement-5; c) understood that Plaintiff would be paying J&E for Equipment-5; d) that Agreement-5 would then commence.

109.  Upon information and belief, the individual Plaintiff spoke to on the phone was not Muthana, but rather Paredes, or an agent of Paredes, who was posing as Muthana in an effort to deceive Plaintiff into believing Muthana was aware of and agreed to Agreement-5, and that Equipment-5 had been accepted by Deveaux.

110.  Thereafter, Paredes provided Plaintiff a copy of a canceled check from Rhino's business checking account, and a completed authorization form for automatic clearing house ("ACH") allowing for Plaintiff to debit the initial payment due under Agreement-5 in the amount of $1,365.78, and thereafter, monthly payments on their due date. Paredes forged Muthana's signature on the ACH form without actual authority or knowledge from Muthana or any employee of Deveaux.

111.  Thereafter, Plaintiff transferred proceeds in the amount of $48,816.00 to J&E representing the purported cost of Equipment-5 as represented in the fraudulent invoice, and the parties thereby closed on the transaction.

112.  Muthana subsequently contacted Plaintiff and denied having knowledge of Agreement-5, denied signing Agreement-5, denied ever having heard of Plaintiff, and stated she believed the transaction to be fraudulent.

113.  Paredes abused his position of trust with Deveaux and Muthana, as his former customers, and used the sensitive identity information of Deveaux and Muthana to steal their identity and impersonate them in applying for Agreement-5 with Plaintiff.

114.  In conjunction with the issuance of the Agreement-5, from approximately July 17, 2023 to July 24, 2023, Paredes made a series of false statements of material fact to Plaintiff including but not limited to the following: 1) that Deveaux was purchasing Equipment-5 from J&E; 2) that

Equipment-5 was delivered to Deveaux; 3) that Muthana signed Agreement-5 when in actuality Paredes forged Muthana's signatures to make it appear as though Deveaux and Muthana entered into Agreement-5 with Plaintiff; 4) that Deveaux knowingly and willingly made the initial payment under Agreement-5 to Plaintiff (i.e., Paredes completed the ACH authorization form without Muthana's knowledge); and 5) that Muthana stated that Equipment-5 was delivered and accepted, and that he understood the terms of Agreement-5 and that it would be commencing (in actuality Paredes or agents of Paredes impersonated Muthana).

115. Paredes, and or the agents of Paredes, knew such false statements of material fact were false at the time they were made to Plaintiff. Or, alternatively, these statements were made reckless disregard of the truth or falsity of the information conveyed.

116. Paredes, and or the agents of Paredes, knew the aforementioned false statements of material fact were indeed false, but made them in order to induce Plaintiff into entering Agreement-5 and issuing funds for the cost of Equipment-5 to J&E.

117. Plaintiff did in fact justifiably rely on those false statements of material fact by issuing Agreement-5 to Deveaux and disbursing funds to J&E accordingly.

118. As a result of Paredes' false statements of material fact made in connection with Agreement-5, Plaintiff has suffered monetary damages in excess of $47,599.22.

119. As Paredes fraudulent inducement of Plaintiff occurred in the course of his employment with J&E, J&E is vicariously liable for this tortious act committed by Paredes.

**WHEREFORE**, Plaintiff BFG Corporation d/b/a Byline Financial Group respectfully requests that the Court enter a judgment in favor of BFG Corporation d/b/a Byline Financial Group and against Defendants, J&E Business Consulting LLC d/b/a J&E Media Corp and Paul Paredes a/k/a Paul Paredes Sr. a/k/a Paul Donoso a/k/a Paul Paredes Donoso a/k/a Paul Paredes Donoso Sr., jointly and severally, and awarding BFG Corporation d/b/a Byline Financial Group i) compensatory

and consequential damages in an amount to be determined at trial, but in any event not less than $47,599.22; ii) reasonable attorneys' fees, costs, expenses, and disbursements as otherwise permitted under the law; and iii) any such other and further relief as the Court deems just, reasonable, or equitable.

**COUNT VI – UNJUST ENRICHMENT**

120.   Plaintiff re-alleges and reincorporates all of the preceding paragraphs as fully set forth herein as Paragraph 120.

121.   In Illinois, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."

*Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) citing *HPI Health Care Servs., Inc.* v. Mt. Vernon Hosp., Inc., 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (1989). Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. *Id.* at 517.

122.   As set forth herein, Defendants were the recipient of monies transferred by Plaintiff to J&E for the financing of equipment sales purportedly made by J&E to the Borrowers, which contrary to Plaintiff's justifiable belief due to Paredes' false statements of material facts, never existed. The monies transferred by Plaintiff to J&E have not been returned to Plaintiff and thus are unjustly retained by J&E and or Paredes to their benefit and to Plaintiff's detriment. This defies the fundamental principles of justice, equity, and good conscience. This Court should, at minimum, order Defendants to return the loan proceeds to Plaintiff.

**WHEREFORE**, Plaintiff BFG Corporation d/b/a Byline Financial Group respectfully requests that the Court enter a judgment in favor of BFG Corporation d/b/a Byline Financial Group and against Defendants, J&E Business Consulting LLC d/b/a J&E Media Corp and Paul Paredes

a/k/a Paul Paredes Sr. a/k/a Paul Donoso a/k/a Paul Paredes Donoso a/k/a Paul Paredes Donoso Sr., jointly and severally, and awarding BFG Corporation d/b/a Byline Financial Group i) compensatory and consequential damages in an amount to be determined at trial, but in any event not less than $221,973.23; ii) reasonable attorneys' fees, costs, expenses, and disbursements as otherwise permitted under the law; and iii) any such other and further relief as the Court deems just, reasonable, or equitable.

### JURY DEMAND

123.   Pursuant to F.R.C.P. Rule 38, Plaintiff requests a trial by jury on all claims so triable.

Respectfully submitted,

Ashen Law Group
Brian Gipson, Esq.
217 N. Jefferson St., Suite 601
Chicago, Illinois 60661
P) 312-655-0800
bgipson@ashenlaw.com
ARDC No. 6335936

*/s/ Brian Gipson*
**Brian Gipson, Esq.**
Attorney for Plaintiff

# Exhibit 1

# JE MEDIACORP

21 Goodway Dr Rochester NY 14623

# INVOICE

Date:    6/02/2023
**INVOICE    #:230699**

**SOLD TO:    KATSUO GRILL & SUSHI INC**
**28569 HESPERIAN BLVD**
**HAYWARD CA 94545**

| Quantity | Description | Total |
|:---:|:---|:---|
| 5 | Elo PayPoint Plus E464529 Android 8.1 with Google Play Services, 15.6-Inch, PCAP, 3GB RAM, 32GB SSD (6 Express Software License included) | $14,250.00 |
| 5 | 12.4-inch 512 MB Android Samsung Tablet S8 | $ 4,000.00 |
| 5 | Epson Thermal C31CE94061 , TMT88VI | $ 2,000.00 . |
| 5 | PAX S300 EMV Microchip Reader EPX (Encryption and programing included) | $ 3,000.00 |
| 13 | 15" Touch Screen Table Self-order Digital Kiosk, 10 PCAP Display, Android 7.1 OS -White | $28,600.00 |
| | Implementation, Installation | $ 3,000.00 |
| | SHIP TO:KATSUO GRILL & SUSHI INC 28569 HESPERIAN BLVD HAYWARD CA 94545 | |

SUBTOTAL.    **$54,850.00**
TAX    **$ 4,388.00**
TOTAL.    **$ 59,238.00**

Thank you for your business!

# Exhibit 2

 Byline Financial Group®

## Equipment Finance Agreement

**Full Legal Name of Secured Party:**
Byline Bank
2801 Lakeside Drive, Suite 212
Bannockburn, IL 60015

**Agreement Number: 78530**

### Debtor Information

| |
|---|
| **Full Legal Name of Debtor: Katsuo Grill & Sushi Inc.** |
| **Address: 1179 W A St, Ste 508 Hayward, CA 94541** |
| **Phone: (510) 963-5921** |
| **Billing Address: 1179 W A St, Ste 508 Hayward, CA 94541** |
| **Equipment Location: 1179 W A St, Ste 508  Hayward, CA 94541** |

### Name and Address of Supplier(s)

| Supplier Name | Address | City | State | Zip | Phone |
|---|---|---|---|---|---|
| J&E Business Consulting LLC dba J&E Media Corp | 21 Goodway Dr, #5B | Rochester | NY | 14623 | |

### Equipment

| Serial Number | Equipment Description |
|---|---|
| | 5ea Elo PayPoint Google Play Services, 15.6 ", PCAP, 3GB RAM, 32GB SSD (6 Express Software Licence included), |
| | 5ea 12.4 " 512 MB Android Samsung Tablet S8, |
| | 5ea Epson Thermal C32CE94061, TMT88VI, |
| | 5ea PAX S300 EMV Microchip Reader EPX (Encryption and programing included), |
| | 13ea 15" Touch Screen Table Self-Order Digital Kiosk, 10PCAP Display, Android 7.1 OS-White, |
| | Implementation, Installation |

### Payment Terms

**Equipment Cost: $59,238.00**

| Payment Terms | | Payment Amount | | One-time documentation fee | Advance Payments |
|---|---|---|---|---|---|
| Terms in months from Commencement Date: | 36 | 1 payments 35 payments | of $5,923.90 of $1,742.08 | $149.00 | $5,923.90 |
| Remittance Period: | Monthly | | | | |

**THIS EQUIPMENT FINANCE AGREEMENT (THIS "AGREEMENT") CONTAINS PROVISIONS SET FORTH BELOW AND ON ALL PAGES OF THIS AGREEMENT, ALL OF WHICH ARE MADE PART OF THIS AGREEMENT.**

**1. AGREEMENT.** Byline Bank dba Byline Financial Group (the "Secured Party") agrees to finance Debtor's purchase of the equipment listed above and on any attached schedule (the "Collateral"). The Agreement commences on the date that it is accepted by Secured Party and Payments shall start on that date or any later date designated by Secured Party and are due thereafter on the same day of each consecutive month at Secured Party's office or such other place as Secured Party may designate. Debtor authorizes Secured Party to adjust the Payment by up to 10% if the cost of the Collateral or taxes differs from the Supplier's estimate. **DEBTOR'S OBLIGATIONS ARE ABSOLUTE, UNCONDITIONAL, AND ARE NOT SUBJECT TO CANCELLATION, REDUCTION, SETOFF OR COUNTERCLAIM.** Debtor agrees to pay the documentation fee shown above. When a Payment is not made within five days when due, Debtor agrees to pay Secured Party a late charge of 10% for each delinquent Payment. If any Payment from Debtor is returned for any reason Secured Party may charge Debtor a returned check or non-sufficient funds charge. DEBTOR ACKNOWLEDGES THAT NO SUPPLIER IS AUTHORIZED TO CHANGE ANY TERM, PROVISION OR CONDITION OF THE AGREEMENT.

**2. NO WARRANTIES.** DEBTOR ACCEPTS THE COLLATERAL "AS IS". SECURED PARTY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO THE COLLATERAL. Secured Party hereby transfers to Debtor all transferable warranties, if any, made to Secured Party by the Supplier(s) of the Collateral. Debtor is required at its own cost to keep the Collateral repaired and maintained in good working order and as required by the manufacturer's warranty, certification and standard full-service maintenance contract, and to pay for all supplies and repairs. Debtor will make all claims about maintenance and service to the third party. Debtor agrees that any claims about maintenance or service will not impact its obligation to pay all Monthly Payments when due. Debtor acknowledges that Secured Party is not the manufacturer's or Supplier's agent, nor is the manufacturer or Supplier an agent of Secured Party. In no event shall Secured Party have any liability for, nor shall Debtor have any remedy against, Secured Party for consequential, special, incidental, or punitive damages, or any loss of profits or savings, loss of use, or any other commercial loss. Secured Party is not responsible for any repairs to or the performance of the Collateral or for any independent maintenance/service agreement which may cover the Collateral.

**3. ASSIGNMENT.** Debtor agrees not to sell, assign, pledge or otherwise encumber or suffer a lien upon or against any interest in the Agreement or Collateral, or to permanently change the location of Collateral without Secured Party's prior written consent. Secured Party may sell, assign, or transfer all or any part of the Secured Party's right, title and interest in and to the Agreement and Collateral and Debtor consents to such assignment and the new owner will have the same rights and benefits of Secured Party and will not have to perform any of Secured Party's obligations and the rights of the new owner will not be subject to any claims, defenses, or setoffs that Debtor may have against Secured Party or any supplier.

**4. SECURITY INTEREST.** Debtor hereby grants to Secured Party a security interest under the Uniform Commercial Code ("UCC") to all of Debtor's right, title and interest in and to the Collateral and all replacements and proceeds thereof. Debtor grants such security interest to secure Debtor's performance of Debtor's obligations to Secured Party under this Agreement. Debtor agrees to pay either directly or as reimbursement to Secured Party any filing, registration and releasing fees required by the UCC or other law. Debtor shall ensure that such security interest is and shall remain a sole and valid first priority security interest in and to the Collateral and all replacements and proceeds thereof (subject only to the lien of current taxes and assessments if such taxes are entitled to priority as a matter of law).

**5. TAXES AND OTHER FEES.** Debtor shall, at Debtor's expense, comply with all laws and regulations relating to the Collateral or to this Agreement, and shall be responsible to pay all license fees and assessments and sales, use, property, excise and other taxes, penalties and interest now and hereafter imposed by any governmental body or agency upon the Collateral, or for the use thereof. In the event that any such fees, assessments, taxes, penalties and other interest attributable to the Collateral or to this Agreement are paid by Secured Party on behalf of Debtor or are found due after the expiration hereof, then upon demand, Debtor shall immediately remit same to Secured Party. Secured Party may charge Debtor an administrative fee for paying property tax on Debtor's behalf. The provisions of this section shall survive the expiration of this Agreement.

*Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation*

PG0223

**6. GENERAL INDEMNIFICATION AND INSURANCE.** Debtor shall indemnify Secured Party against and hold Secured Party harmless from any and all claims, actions, damages, including reasonable attorneys' fees, obligations, liabilities and liens, (including any of the foregoing arising or imposed without Secured Party's fault or negligence, or under the Doctrine of Strict Liability), arising out of the manufacture, purchase, possession, operation, condition or use of Collateral, or by operation of law. Debtor agrees that upon written notice by Secured Party of such a claim, damage, action, obligation, liability or lien, Debtor shall assume full responsibility for the defense thereof. The provisions of this section shall survive the termination of the Agreement. Debtor shall, at all times during this Agreement, (i) bear the risk of loss and damage to the Collateral and shall continue performing all Debtor's obligations to Secured Party even if the Collateral becomes damaged or suffers a loss, (ii) keep the Collateral insured against all risks of damage and loss in an amount equal to its replacement cost, with Secured Party named as "loss payee," and (iii) carry public liability insurance covering bodily injury and property damage in an amount acceptable to Secured Party, with Secured Party named as "additional insured." Debtor has the choice of satisfying these insurance requirements by providing Secured Party with satisfactory evidence of Property and Liability insurance, within 30 days of the Commencement Date of this Agreement. Such insurance must provide for at least 30 days prior written notice to Secured Party before it may be cancelled or terminated. **If Debtor does not provide Secured Party with proof of insurance within 30 days of the Commencement Date, or if such insurance terminates for any reason, then (a) Debtor agrees that Secured Party has the right, but not the obligation, to obtain such insurance in such forms and amounts from an insurer of Secured Party's choosing in order to protect its interests, and (b) Debtor agrees to reimburse Secured Party for any insurance premiums and related costs, including a reasonable fee to Secured Party for placing and maintaining such coverage which may include a profit. Secured Party is not obligated to obtain, and may cancel, such insurance at any time without notice to Debtor. The insurance charges may be higher than if Debtor obtained Property and Liability Insurance on Debtor's own.**

**7. COLLATERAL USE AND MAINTENANCE.** Debtor, at its own cost and expense, agrees to (a) use the Collateral in conformity with all manufacturer's instructions and manuals; (b) keep the Collateral repaired and maintained in good working order and as required by the manufacturer's warranty, certification and standard full service maintenance contract; (c) furnish all parts, mechanisms, devices and servicing required thereof and (d) give Secured Party or its agents reasonable access to inspect the Collateral and its maintenance and other records.

**8. PREPAYMENT:** So long as no default exists hereunder and upon the prior written consent of Secured Party, Debtor may prepay the Agreement in whole, but not in part, the entire indebtedness due thereunder by paying the sum of (i) all accrued and unpaid Payments and other charges Debtor owes Secured Party and (ii) the present value of all remaining Payments discounted at the rate of 2% (collectively, the "Agreement Balance").

**9. DEFAULT.** Time is of the essence for this Agreement. No waiver by Secured Party of any breach or default shall constitute a waiver of any other breach or default by Debtor or waiver of any of Secured Party's rights. The following are Events of Default under this Agreement: (1) Debtor fails to pay any Payment or other charges herein provided ("Charges") within five (5) days after the same is due and payable; (2) Debtor fails to observe, keep or perform any other provision of this Agreement required to be observed, kept or performed by Debtor, (3) Debtor ceases doing business as a going concern; (4) Debtor or any guarantor become insolvent, are liquidated or dissolved, merge, transfer substantially all stock or assets, stop doing business, or assign rights or property for the benefit of creditors; (5) a petition is filed by or against Debtor or any guarantor under the Bankruptcy Code; (6) Debtor, without Secured Party's prior written consent, attempts to remove, sell, transfer, encumber, sublet or part with the possession of said Collateral, (7) Debtor breaches any other agreement between Debtor and Secured Party or any of Secured Party's affiliates, (8) Debtor suffers an adverse material change in its financial condition and Secured Party deems itself insecure.

**10. REMEDIES.** Upon the occurrence of an Event of Default, Secured Party or its agent shall have the right to exercise any one or more of the following remedies:: (A) cancel the Agreement, (B) require Debtor to return the Collateral, (C) take possession of and/or render the Collateral (including any software) unusable, and for such purposes Debtor hereby authorize Secured Party and its designees to enter Debtor's premises, with or without prior notice or other process of law, (D) require Debtor to pay to Secured Party, on demand, AS LIQUIDATED DAMAGES FOR LOSS OF BENEFIT OF THE BARGAIN AND NOT AS A PENALTY, an amount equal to the Agreement Balance, and/or (E) exercise any other remedy available to Secured Party under law. Debtor also agrees to reimburse Secured Party on demand for all reasonable expenses incurred in connection with the enforcement of Secured Party's remedies including, without limitation, repossession, repair and collection costs, attorneys' fees and court costs. In the event Secured Party is successful in remarketing the Collateral, Secured Party shall give Debtor a credit against the balance due in an amount equal to the proceeds received and to be received from Remarketing minus the above-mentioned costs (the "Net Proceeds"). If the Net Proceeds are less than the Balance Due, Debtor shall be liable for such deficiency. If the Net Proceeds are greater than the Balance Due, Secured Party shall pay Debtor such surplus. Any said taking of possession shall not constitute a termination of this Agreement and shall not relieve Debtor of its original obligation herein unless Secured Party expressly so notifies Debtor in writing. Secured Party, at its sole discretion, shall have the right of set off with regard to any agreement between the parties.

**11. NOTICE.** For the purpose of this Agreement, any notices and demands required to be given shall be given to the parties in writing and sent by certified mail or recognized overnight courier at the address herein set forth, or to such other address as the parties may hereinafter substitute by written notice.

**12. SELECTION OF COLLATERAL.** Debtor acknowledges that Debtor has selected both the Collateral and the Supplier and Secured Party has not selected, manufactured or supplied the Collateral. **TO THE EXTENT PERMITTED BY LAW, DEBTOR WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A DEBTOR BY ARTICLE 9 OF THE UCC.**

**13. APPLICABLE LAW; VENUE; JURISDICTION.** This Agreement a shall be deemed to have been made in Lake County, Illinois, regardless of the order in which the signatures of the parties shall be affixed hereto. In the event that any litigation or other legal proceedings shall arise under and/or in connection with this Agreement and/or the Collateral, such litigation or other legal proceeding shall be conducted in any federal or state court located within or for Lake County, Illinois. **FURTHERMORE, DEBTOR CONSENTS TO PERSONAL JURISDICTION AND VENUE IN ANY FEDERAL OR STATE COURT LOCATED WITHIN OR FOR LAKE COUNTY, ILLINOIS** and Debtor hereby waives any defenses or objections thereto including defenses based on the Doctrine of Forum Non Conveniens. This Agreement shall be interpreted, and the rights and liabilities of the parties hereto determined, in accordance with the laws of the State of Illinois. **DEBTOR EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY.**

**14. SAVINGS CLAUSE.** If any amount charged or collected under this Agreement is greater than the amount allowed by law, including any amount that exceeds applicable usury limits, then any excess amount collected by Secured Party will be refunded to Debtor or applied to any other amount then due. If any other provision hereof or any remedy provided for is invalid under any applicable law, such provision shall be inapplicable and deemed omitted, but the remaining provisions hereof, including the remaining default remedies, shall be given effect in accordance with the manifest intent hereof.

**15. MISCELLANEOUS.** This instrument constitutes the entire agreement between the parties. Debtor understands and agrees that neither the equipment Supplier nor its sales personnel are agents of Secured Party. No Supplier or agent thereof is authorized to bind Secured Party or to waive or modify any term herein. No waiver by Secured Party of any provision hereof shall constitute a waiver of any other term. Debtor agrees that a facsimile or electronic copy of the Agreement with facsimile or electronic signatures may be treated as an original and will be admissible as evidence of the Agreement; provided, however, only the executed copy which is marked "Original" and is in Secured Party's possession shall constitute chattel paper under the UCC.

THIS AGREEMENT IS EFFECTIVE ONLY UPON SIGNING BY BOTH PARTIES. THIS AGREEMENT IS NON-CANCELLABLE BY DEBTOR. THE SIGNATORY FOR THE DEBTOR BELOW WARRANTS AND REPRESENTS THAT THEY ARE AUTHORIZED TO EXECUTE THIS AGREEMENT ON BEHALF OF THE DEBT

| Secured Party: **Byline Bank** | Debtor: **Katsuo Grill & Sushi Inc.** |
|---|---|
| By: | By: |
| Name: | Name: _Kwong Tsang_ |
| Title: | Title: _CEO_ |
| Date: | Date: _6/20/23_ |

*Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation*



Agreement Number: 78530

**INDIVIDUAL GUARANTY**

In consideration of **Byline Financial Group** ("Byline") entering into Agreement Number 78530 (the "Agreement") with Katsuo Grill & Sushi Inc. ("Customer"), the undersigned guarantor ("Guarantor") hereby unconditionally and irrevocably guarantees to Byline or its assignee(s) the full and prompt payment and full performance by Customer of all obligations under the Agreement. Guarantor also agrees that Byline may make other arrangements with the Customer and Guarantor will still be responsible for those payments and other obligations. Guarantor consents to any modification, amendment or extension of the Agreement without releasing Guarantor's obligation under this Guaranty. If Customer defaults, Guarantor will immediately pay in accordance with the default provisions of the Agreement all sums due under the terms of the Agreement and will perform all other obligations of Customer under the Agreement. Guarantor hereby waives the right to require Byline to (a) proceed against Customer or any other guarantor, (b) proceed against or exhaust the Equipment or Collateral, or (c) pursue any other right or remedy for the benefit of Guarantor. Guarantor waives any defense arising by reason of any defense of the Customer or by reason of the cessation, from any cause whatsoever, of the liability of the Customer under the Agreement. Guarantor waives any and all demands for performance, notices of nonperformance or default, and notices of cancellation or forfeiture. Byline may apply all proceeds received from the Customer or others to such part of the Customer's indebtedness as Byline may deem appropriate without consulting Guarantor and without prejudice to or in any way limiting or lessening the liability of Guarantor under this Guaranty. In addition, the undersigned agrees to pay all reasonable expenses incurred by Byline as a result of Customer's default, including but not limited to equipment repair, replacement and shipping cost, attorney's fees and court costs.

The obligations of the undersigned are joint and several, and are independent of the obligation of Customer and a demand and/or separate action or actions may be brought against Guarantor, whether or not action is brought against the Customer or whether the Customer be joined in any action or actions, the liability of Guarantor hereunder being primary. Guarantor hereby waives the benefit of any suretyship defenses affecting its liability hereunder or the enforcement hereof.

**This Guaranty shall be deemed to have been made in Lake County, Illinois. In the event that any litigation or other legal proceeding shall arise under and or in connection with this Guaranty, such litigation or other proceeding shall be conducted in a state or federal court located within or for Lake County, Illinois. Furthermore, the undersigned hereby accepts and consents to jurisdiction and venue in any state or federal court located within or for Lake County, Illinois. Guarantor agrees not raise any objection concerning any inconvenience this may cause Guarantor. This Guaranty shall be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State of Illinois. The undersigned expressly waives the right to trial by jury.** Guarantor agrees that a facsimile or electronic copy of this Guaranty, with facsimile or electronically transmitted signatures may be treated as an original and will be admissible as evidence of the Guaranty.

X _____
(Signature) (no titles)

Print Name: Kwong Tsang
Date: 6/20/13

*Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation*

 Byline Financial Group

**Equipment Finance Agreement Number:** 78530

## DELIVERY AND ACCEPTANCE CERTIFICATE

**Debtor: Katsuo Grill & Sushi Inc.**
**Secured Party: Byline Bank dba Byline Financial Group**

**Equipment Description:**
5ea Elo PayPoint Google Play Services, 15.6 ", PCAP, 3GB RAM, 32GB SSD (6 Express Software Licence included), 5ea 12.4 " 512 MB Android Samsung Tablet S8, 5ea Epson Thermal C32CE94061, TMT88VI, 5ea PAX S300 EMV Microchip Reader EPX (Encryption and programing included), 13ea 15" Touch Screen Table Self-Order Digital Kiosk, 10PCAP Display, Android 7.1 OS-White, Implementation, Installation

**Equipment Location:** 1179 W A St, Ste 508 Hayward, CA 94541

The undersigned hereby certifies that all the Equipment described above has been delivered, inspected, and irrevocably accepted by the Debtor and is now subject to the Agreement referred to above. The decals, labels, etc., if required and supplied, have been affixed to the Equipment. Debtor approves payment by Byline Financial Group to the Supplier for the Equipment as well as for any services or supplies described in the Agreement.

Debtor acknowledges that its obligations under the Agreement are absolute and unconditional and understand that any shortcomings in the Equipment or its operation, without reservation, will not be grounds for withholding of any Payments due or to become due under the Agreement.

Delivery and Acceptance Date: _6/20/23_

**Debtor: Katsuo Grill & Sushi Inc.**

BY:  Kwong Tsang

Print Name and Title:  CEO

Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation

PG0223

# Exhibit 3

**JE MEDIACORP**  DATE: 06/20/2023

21 Goodway Dr Rochester NY 14623  INVOICE # 872345

**SOLD TO:  RHINOS PIZZA INC**
**85 DONOVAN ST, WEBSTER NY 14580**

| Quantity | Description | Total |
|---|---|---|
| 3 | **Elo PayPoint Plus E464529 Android 8.1 with Google Play Services, 15.6-Inch, PCAP, 3GB RAM, 32GB SSD (6 Express Software License included)** AD-9123-627/AD-5379-813/AD-8140-427/ | $  7,125.00 |
| 3 | **12.4-inch 512 MB Android Samsung Tablet S8** 913-527-617/913-178-293/913-142-132 | $ 2,400.00 |
| 3 | **Epson Thermal C31CE94061 , TMT88VI** /EP-810001/EP153012/EP-014119 | $ 1,200.00 . |
| 3 | **PAX S300 EMV Microchip Reader EPX (Encryption and programing included)** PAX-81520/PAX-429120/PAX-20377 | $ 1,500.00 |
| 6 | **15" Touch Screen Table Self-order Digital Kiosk, 10 PCAP Display, Android 7.1 OS - White** KS-913-143/KS-416-552/KS-216-814/KS-438=120 KS-519-437/KS-327-715 | $18,600.00 |
| 2 | **KDS Kitchen monitors 50'** KDS-627289/KDS8754841 | $ 4,080.00 |
| | **Implementation, Installation** **SHIP TO:RHINOS PIZZA  INC 85 DONOVAN ST WEBSTER NY 14580** | $ 3,000.00 |

SUBTOTAL. **$37.905.00**
TAX **$ 3,032.00**
**$40,937.04**
TOTAL

Thank you for your business!

# Exhibit 4

 Byline Financial Group

## Equipment Finance Agreement

**Full Legal Name of Creditor:**
BFG Corporation dba Byline Financial Group
2801 Lakeside Drive, Suite 212
Bannockburn, IL 60015

Agreement Number: 78676

### Debtor Information

Full Legal Name of Debtor: Rhino's Pizzeria. Inc.
Address: 85 Donavan St. Webster, New York 14580
Phone: (585) 872-3150
Billing Address: 85 Donavan St. Webster, NY 14580
Equipment Location: 85 Donavan St. Webster, NY 14580

### Name and Address of Supplier(s)

| Supplier Name | Address | City | State | Zip | Phone |
|---|---|---|---|---|---|
| J&E Business Consulting LLC dba J&E Media Corp 14623 | 21 Goodway Dr, #5B | Rochester, | | NY | |

### Equipment

Serial Number    Equipment Description
Equipment further described per Exhibit A attached hereto and made a part hereof

### Payment Terms

**Original Cost of Equipment: $40,937.04**

| Payment Terms | | Payment Amount | | One time documentation and UCC filing fee | Advance Payments |
|---|---|---|---|---|---|
| Terms in months from Commencement Date: 48 Payment Period: Monthly | 48 | payments | of $ 1015.76 | $149.00 | $1,015.76 |

THIS EQUIPMENT FINANCE AGREEMENT (THIS "AGREEMENT") CONTAINS PROVISIONS SET FORTH BELOW AND ON ALL PAGES OF THIS AGREEMENT, ALL OF WHICH ARE MADE PART OF THIS AGREEMENT.

As additional inducement for Creditor to enter into this Agreement, the undersigned (individually and collectively referred to herein as "Guarantor") unconditionally personally guarantees Creditor, it successors and assigns, the full and prompt payment and performance of all present and future obligations under this Agreement. Guarantor agrees that Creditor, without consent and agreement from any guarantor, may make other arrangements including compromise or settlement with the Debtor named above. The Guarantor waives all defenses and notice of those changes and will remain responsible for the payment and obligations of this Agreement. Creditor does not have to notify Guarantor if the Debtor is in default. If the Debtor defaults, Guarantor will immediately pay in accordance with the default provision of this Agreement all sums due under the terms of this Agreement and will perform all the obligations of the Debtor under this Agreement. THIS GUARANTY IS SUBJECT TO AND INCORPORATES ALL TERMS OF THIS AGREEMENT INCLUDING BUT NOT LIMITED TO PARAGRAPH 14 OF THIS AGREEMENT. If it is necessary for Creditor to proceed legally to enforce this guaranty, Guarantor agrees to pay all costs, including attorneys' fees incurred in enforcement of this guaranty. It is not necessary for Creditor to proceed first against the Debtor before enforcing this guaranty. By signing this guaranty, the Guarantor authorizes Creditor to obtain personal credit bureau reports for credit and collection purposes.

GUARANTOR NAME (no title): Tracy Malloy          SIGNATURE:X _Namully_

EFANA0223

1. **FINANCE AGREEMENT.** Subject to the terms of this Agreement signed by Creditor and Debtor, Debtor has requested that Creditor provide financing to enable Debtor to purchase the equipment described above (such personal property, hardware, software, services and any upgrades, replacements, repairs and additions referred to as "Equipment") which Debtor will use for business purposes only. Debtor hereby grants Creditor a first priority, purchase money security interest in the Equipment and its proceeds to secure Debtor's obligations hereunder and under all other agreements with Creditor (collectively "Other Agreements"), so long as but only to the extent that Creditor (or if this Agreement is assigned to another party, then such assignee) is the lessor, lender secured party or other similar party under such Other Agreements. Debtor agrees to all of the terms and conditions contained in this Agreement, which together are a complete statement of Creditor and Debtor's agreement regarding the Equipment.

2. **PAYMENTS.** Debtor will pay the documentation fee and any advance payments on the date Debtor delivers this Agreement. The "Acceptance Date" is the date on which Debtor verbally accepts this Agreement. The "Commencement Date" will be the Acceptance Date and the Payments will begin on the first day of the payment period following the Commencement Date and shall continue thereafter to be paid on the same day of each subsequent month or other calendar period and for the time period specified in this Agreement. Charges from the Commencement Date to the date the Payments begin shall be computed by converting the Payment to a daily rate based on a 30 day month. Debtor will make all Payments required under this Agreement at such address as Creditor may specify in writing. Creditor shall satisfy Debtor's payment obligations to Supplier as defined herein related to the Products and Services and thereafter Debtor shall pay to Creditor the Payments and other charges, commencing as of the Commencement Date, and continuing thereafter as specified in this Agreement. Debtor acknowledges and agrees Creditor may receive an undisclosed discount, credit or rebate from Supplier which shall be solely for Creditor's account and benefit and shall not accrue to Debtor in any manner whatsoever. If the cost of the Products varies from the estimate Debtor or Supplier have provided to Creditor, Debtor agrees Creditor may adjust the payment accordingly upward or downward up to 10%. If for any reason, Debtor's check or automatic payment request is returned due to insufficient funds or a stop payment, a $50.00 fee will be assessed. Creditor may impose a late charge of 10% of any past-due payment or other sums due hereunder and may, in addition, charge interest on the unpaid amount at eighteen percent (18%) per annum, or, if less, the maximum rate permitted by applicable law.

3. **PREPAYMENT.** Upon prior written consent of Creditor (which consent shall not be unreasonably withheld, conditioned or delayed), Debtor may prepay in whole (but not in part) the entire indebtedness due hereunder by paying the sum of the following: any accrued and unpaid Payments and other amounts then due under this Agreement, plus accrued late charges and interest thereon; plus the aggregate of all Payments not yet due and payable hereunder discounted to present value at 2%.

4. **NON-CANCELLABLE. THIS IS A NON-CANCELLABLE AGREEMENT AND MAY NOT BE CANCELLED BY DEBTOR FOR ANY REASON WHATSOEVER. DEBTOR WILL MAKE ALL PAYMENTS WHETHER OR NOT IT IS SATISFIED WITH THE EQUIPMENT AND WITHOUT DEDUCTION FOR ANY CLAIM DEBTOR MAY HAVE AGAINST THE SUPPLIER OF THE EQUIPMENT OR AGAINST CREDITOR.**

5. **WARRANTY DISCLAIMER. CREDITOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR THAT THE EQUIPMENT IS MERCHANTABLE.** DEBTOR AGREES THAT IS HAS SELECTED THE SUPPLIER AND EACH ITEM OF EQUIPMENT BASED UPON ITS OWN JUDGMENT AND DISCLAIM ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY CREDITOR. CREDITOR DOES NOT TAKE RESPONSIBILITY FOR THE INSTALLATION OR PERFORMANCE OF THE EQUIPMENT. THE SUPPLIER IS NOT AN AGENT OF CREDITOR AND NOTHING THE SUPPLIER STATES CAN AFFECT DEBTOR'S OBLIGATION UNDER THIS AGREEMENT. DEBTOR WILL CONTINUE TO MAKE ALL PAYMENTS UNDER THIS AGREEMENT REGARDLESS OF ANY CLAIM OR COMPLAINT AGAINST SUPPLIER.

6. **LOCATION OF EQUIPMENT/INSPECTION.** Debtor is the owner of the Equipment and agrees to keep the Equipment free and clear of all liens and encumbrances and use only at Debtor's address shown above and Debtor agrees not to move it unless Creditor agrees to it in advance in writing. Creditor may inspect the Equipment at any time during normal business hours.

7. **LOSS OR DAMAGE.** Debtor will bear all risk of loss, theft, damage and destruction to any item of Equipment. No such loss or damage relieves Debtor from the payment obligations under this Agreement. Debtor agrees to promptly notify Creditor in writing of any loss or damage and shall thereafter place the item of Equipment in good repair, condition and working order; provided however, that if such item of Equipment is determined by Creditor to be lost, stolen, destroyed or damaged beyond repair or is requisitioned or suffers a constructive total loss under an insurance policy carried hereunder, Debtor shall pay Creditor an amount equal to any accrued and unpaid Payments and other amounts then due under this Agreement, plus accrued late charges and interest thereon; plus the aggregate of all Payments not yet due and payable hereunder discounted to present value at 2% per year.

8. **COLLATERAL PROTECTION AND INSURANCE.** Debtor agrees to keep each item of Equipment fully insured against loss, naming Creditor as loss payee, in an amount requested by Creditor but in any event in an amount no less than the replacement cost of the Equipment until this Agreement is terminated as to such item. Any proceeds of insurance will be paid to Creditor and credited against the outstanding balance due under this Agreement. Debtor agrees to provide Creditor certificates or other evidence of insurance acceptable to Creditor, before this Agreement begins or, should Debtor fail to provide Creditor with evidence of insurance required hereby, Creditor shall have the right, but not be obligated, to obtain insurance covering Creditor's interest in the Equipment. In that event, Debtor shall reimburse Creditor on demand for the cost thereof, including, without limitation, Creditor's fees for services in placing and maintaining such insurance, on which we may earn a profit. Debtor shall maintain the Equipment in good repair, condition and working order, ordinary wear and tear excepted. Debtor will use the Equipment only as permitted by law and such insurance.

9. **INDEMNITY.** Creditor is not responsible for any loss or injuries caused by the installation or use of the Equipment. Debtor agrees to indemnify and hold harmless Creditor, its successors and assigns, employees, officers, directors and agents from and against any and all claims and suits for any loss, damage or injury sustained by any person whatsoever by reason of the sale, financing, use, possession or disposition of the Equipment and, in connection therewith, Debtor shall pay the costs of all reasonable legal fees and all other reasonable expenses incurred by Creditor, its successors and assigns.

10. **TAXES, FEES AND TITLING.** Debtor agrees to pay when due all taxes, fees including registrations, fines, penalties and other governmental assessments relating to this Agreement or the Equipment. If Creditor pays any of the above for Debtor, Debtor agrees to reimburse Creditor and to pay Creditor a processing fee for each payment Creditor makes on Debtor's behalf. Debtor also agrees to pay Creditor any filing fees prescribed by the Uniform Commercial Code and reimburse Creditor for all costs and expenses involved in documenting and servicing this Agreement. If requested by Creditor, Debtor shall cause an item of Equipment subject to title registration laws to be titled as directed by Creditor. Debtor shall advise Creditor as to any necessary retitling.



Initials:

**11. ASSIGNMENT.** DEBTOR HAS NO RIGHT TO SELL, TRANSFER, ASSIGN OR SUBLEASE THE EQUIPMENT OR THIS AGREEMENT. Debtor understands that Creditor, without prior notice, has the right to assign this Agreement to another financing source without Debtor's consent. Debtor understands that the assignee will have the same rights and benefits but they do not have to perform any of Creditor's obligations. Debtor agrees that the rights of assignee will not be subject to any claims, defenses, or setoffs that Debtor may have against Creditor.

**12. DEFAULT AND REMEDIES.** Any of the following constitutes an event of default hereunder: (a) Debtor's failure to pay any amount due hereunder, within five (5) business days of when due; (b) Debtor's default in performing any other obligation hereunder or under any other agreement between Debtor and Creditor; (c) any representations or warranties by Debtor set forth in or made in connection with this Agreement shall prove materially false or misleading; (d) death or judicial declaration of incompetency of Debtor or a Guarantor, if an individual or partner, (e) the filing by or against Debtor or Guarantor of a petition under the Bankruptcy Code or under insolvency law or law providing for the relief of debtors, including without limitation, a petition for reorganization, agreement or extension; (f) the making of an assignment of a substantial portion of its assets by Debtor for the benefit of creditors, appointment of a receiver or trustee for Debtor or for any of Debtor's assets. If Debtor is in default under this Agreement, then Creditor, at its sole election, shall have the right to exercise any or all of the following with or without notice: (i) declare immediately due and payable the entire amount of all of Debtor's obligations hereunder, without setoff; (ii) take possession of and, if deemed appropriate, render unusable any or all items of Equipment, wherever located, without process of law and without liability for any damages occasioned by such taking of possession including damages to Debtor's property; (iii) require Debtor to assemble any or all items of Equipment at a location in reasonable proximity to their designated location hereunder; (iv) sell or otherwise dispose of any items of Equipment in a commercially reasonable manner at public or private sale. The proceeds of sale, lease or other disposition shall first be applied to all costs and expenses incurred in taking, removing, holding, repairing and selling or otherwise disposing of the Equipment, attorneys fees and court costs. Debtor will be obligated to pay any deficiency remaining after such application of proceeds. Creditor may recover interest on any unpaid balance at the rate of eighteen percent (18%) per annum. Creditor may also exercise any of the remedies available to it under Article 9 of the Uniform Commercial Code as enacted in the State of Illinois or under any other law or in equity. All remedies are cumulative. Debtor agrees that any delay or failure by Creditor to enforce its rights under this Agreement does not prevent Creditor from enforcing any rights at a later time, and the exercise of any remedy shall not prevent the exercise of any other remedy.

**13. UCC FILINGS.** Debtor authorizes Creditor to record such financing statements, title certificates and instruments as Creditor deems necessary to perfect and protect its security interest, without Debtor's signature, and if such signature is needed, Debtor appoints Creditor as Debtor's attorney-in-fact to sign such items in Debtor's name. As additional security, in any jurisdiction where the Uniform Commercial Code is in effect, you grant to us a security interest in all the property you own or acquire, including any goods, chattel paper, equipment, accounts, deposit accounts, instruments, contract rights and general intangibles, wherever located as well as any related proceeds. Debtor agrees to take any other action Creditor requests to protect Creditor's rights under this Agreement from time to time and that Creditor may record a copy of this Agreement as a financing statement. Debtor will provide any landlord or mortgagee waiver Creditor requests to protect Creditor's interest in the Equipment. Debtor authorizes Creditor to endorse Debtor's name to any notes, checks, or other instruments for the payment of money relating to the Equipment (including insurance).

**14. LAW AND JURISDICTION.** THIS AGREEMENT WILL BE DEEMED FULLY EXECUTED AND PERFORMED IN ILLINOIS OR THE HOME STATE OF CREDITOR'S ASSIGNEE AS IT MAY BE ASSIGNED FROM TIME TO TIME PER PARAGRAPH 11. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF ILLINOIS. DEBTOR EXPRESSLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION AND VENUE OF ANY COURT IN LAKE COUNTY, ILLINOIS OR ASSIGNEE'S HOME STATE AND WAIVES RIGHT TO TRIAL BY JURY FOR ANY CLAIM OR ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EQUIPMENT. FURTHERMORE, DEBTOR WAIVES THE DEFENSE OF INCONVENIENT FORUM.

**15. MISCELLANEOUS.** If any interest payment hereunder exceeds the highest amount allowed by law, it shall be reduced to such rate and the excess interest refunded to Debtor. In such event, Debtor agrees Creditor will not be subject to any penalties provided by law for collecting or charging interest in excess of lawful rates. This Agreement may be modified only by written agreement and not by course of performance. This Agreement becomes valid upon execution by Creditor and will begin on the Commencement Date and for the number of consecutive months shown above. All notices shall be given in writing by the party sending the notice and shall be effective when mailed by certified or registered mail addressed to the party receiving the notice at its address shown on the front of this Agreement (or to any other address specified by that party in writing) with postage prepaid. If any provision of this Agreement is declared unenforceable, the other provisions shall remain in full force and effect. This Agreement constitutes the entire agreement of the parties as to the subject matter and shall not be amended, altered or changed except by a written agreement signed by the parties.

**16. TRANSMITTAL.** Creditor and Debtor agree a scanned copy, photocopy or facsimile copy of this Agreement, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original of the documents and "best evidence" of the parties' agreement, and shall be binding on Debtor as if it were manually signed and personally delivered. Debtor agrees the document will be admissible in any legal action. To the extent this Agreement constitutes chattel paper under the UCC, a security interest in this Agreement may be created through the transfer and possession of a copy of this Agreement executed by Creditor without the need to transfer possession of any other copy of this Agreement, or any other related documents or instruments. Creditor has no duty to verify or inquire as to the validity, execution, signer's authority or any other matter concerning the propriety of any copy.

ACCEPTANCE: BY SIGNING THIS AGREEMENT: (I) YOU ACKNOWLEDGE YOU HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS ON ALL PAGES OF THIS AGREEMENT (II) YOU AGREE YOU CANNOT TERMINATE OR CANCEL THIS AGREEMENT, YOU HAVE AN UNCONDITIONAL OBLIGATION TO MAKE ALL PAYMENTS DUE UNDER THIS AGREEMENT, AND YOU CANNOT WITHHOLD, SET OFF OR REDUCE SUCH PAYMENTS FOR ANY REASON. You agree a scanned copy, photocopy or facsimile copy of this Agreement, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original.

Creditor: **BFG Corporation dba Byline Financial Group**

Signature: _____

Name: _____

Title: _____

Date: _____

Debtor: **Rhino's Pizzeria, Inc.**

Signature: _____

Name: Tracy Malloy

Title: Owner

Date: 8-22-23

 Byline Financial Group™

2801 Lakeside Drive, Suite 212 Bannockburn, IL 60015
Toll Free Phone (877) 497-2811  Fax (847) 283-7260

# EXHIBIT A

AGREEMENT NO. 78676
DEBTOR: Rhino's Pizzeria. Inc.

The items set forth herein are incorporated into the Equipment Information section of the above referenced Agreement:

| Quantity | Description |
|---|---|
| 3 | Elo PayPoint Plus E464529 Android 8.1 with Google Play Services, 15.6-inch, PCAP, 3GB RAM, 32GB SSD (6 Express Software License included) |
| 3 | 12.4-Inch 512 MB Android Samsung Tablet S8 |
| 3 | Epson Thermal C31CE94061 , TMT88VI |
| 3 | PAX S300 EMV Microchip Reader EPX (Encryption and programing included) |
| 6 | 15" Touch Screen Table Self-order Digital Kiosk, 10 PCAP Display, Android 7.1 OS -White |
| 2 | KDS Kitchen monitors 50' Implementation, Installation |

Customer agrees a scanned copy, photocopy or facsimile copy of this Exhibit A, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original.

IN WITNESS WHEREOF, the parties hereto, by their authorized signatories, have executed this document at the date set forth below their respective signatures.

Byline Financial Group

Signature: _Amy Womb_

Name: _Amy Fisher_

Title: _AVP_

Date: _6/26/23_

DEBTOR:
Rhino's Pizzeria. Inc.

Signature: _Tracy Malloy_

Name: Tracy Malloy

Title: _Owner_

Date: _6 - 22 - 23_

Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation

BFAEXA0123

# Exhibit 5



**J&E MEDIA CORP**
21 GOODWAY DR, SUITE B5
ROCHESTER,. NY 14623
(585) 445-8300
SALES@JEMEDIACOPR.COM

# INVOICE

BillTo: **KEN'S PIZZA CORNER LLC**
Address: **5665 W HENRIETTA RD, HENRIETTA NY 14586**
Invoice # 230706
Date: 07/05/2023

| DESCRIPTION | QTY | PRICE | TOTAL |
|---|---|---|---|
| Elo PayPoint Plus E464529 Android 8.1 with Google Play Services, 15.6-Inch, PCAP, 3GB RAM, 32GB SSD (5 Retail-Svc Software License) S/N: AD-8345-186 / AD-8353-183 / AD-0263-126/ AD-8930-332 | 4 | | $11,400.00 |
| 12.4-inch 512 MB Android Samsung Tablet S8 S/N: 824-111-729 / 286-220-450 / 256-288-001 / 283-720-388 | 4 | | $3,200.00 |
| Epson Thermal C31CE94061 S/N: EP-528299 / EP-163800/ EP-188229/ EP-882941 | 4 | | $1,600.00 |
| PAX S300 EMV Microchip Reader EPX (Encryption and programing) PAX-72911 PAX-82048 / PAX-61088 / PAX-63922 | 4 | | $2,400.00 |
| 4' Tall Self order Kiosks, 10PCAP Display, Andorid 7.1OS KS-881-1677/KS-991-7024/KS-562-8250/KS-919-8281 | 4 | | $12,800.00 |
| KDS Kitchen Monitors 42'' Touch Screen KDS-4259-021/KDS-4282-142/KDS-5382-320/KDS-6496-277 | 2 | | $5,600.00 |
| Implementation / Instalation | 1 | | $2,000.00 |

| | SUBTOTAL | $39,000.00 |
|---|---|---|
| | TAX | $3,120.00 |
| | TOTAL | $42,120.00 |

Notes:
Shipped to: Ken's Pizza Corner LLC
Address: 5665 W HENRIETTA RD, HENRIETTA NY 14586

*Thank you for your Business!*

# Exhibit 6

 Byline Financial Group

**Equipment Finance Agreement**

**Full Legal Name of Creditor:**
BFG Corporation dba Byline Financial Group
2801 Lakeside Drive, Suite 212
Bannockburn, IL 60015

**Agreement Number:** 78938

### Debtor Information

**Full Legal Name of Debtor: Ken's Pizza Corner, LLC**
  Address: 5665 W. Henrietta Rd. West Henrietta, New York 14586
Phone: (585) 397-1994
Billing Address: 5665 W. Henrietta Rd. West Henrietta, NY 14586
Equipment Location: 5665 W. Henrietta Rd. West Henrietta, NY 14586

### Name and Address of Supplier(s)

| Supplier Name | Address | City | State | Zip | Phone |
|---|---|---|---|---|---|
| J&E Business Consulting LLC dba J&E Media Corp 14623 | 21 Goodway Dr, #5B | Rochester, | NY | | |

### Equipment

**Serial Number    Equipment Description**
  POS System more fully described per Exhibit A

### Payment Terms

**Original Cost of Equipment: $42,120.00**

| Payment Terms | Payment Amount | One time documentation and UCC filing fee | Advance Payments |
|---|---|---|---|
| Terms in months from Commencement Date: 48 <br> Payment Period   Monthly | 48   payments   of $ 1049.88 | $149.00 | $1,049.88 |

**THIS EQUIPMENT FINANCE AGREEMENT (THIS "AGREEMENT") CONTAINS PROVISIONS SET FORTH BELOW AND ON ALL PAGES OF THIS AGREEMENT, ALL OF WHICH ARE MADE PART OF THIS AGREEMENT.**

As additional inducement for Creditor to enter into this Agreement, the undersigned (individually and collectively referred to herein as "Guarantor") unconditionally personally guarantees Creditor, it successors and assigns, the full and prompt payment and performance of all present and future obligations under this Agreement. Guarantor agrees that Creditor, without consent and agreement from any guarantor, may make other arrangements including compromise or settlement with the Debtor named above. The Guarantor waives all defenses and notice of those changes and will remain responsible for the payment and obligations of this Agreement. Creditor does not have to notify Guarantor if the Debtor is in default. If the Debtor defaults, Guarantor will immediately pay in accordance with the default provision of this Agreement all sums due under the terms of this Agreement and will perform all the obligations of the Debtor under this Agreement. THIS GUARANTY IS SUBJECT TO AND INCORPORATES ALL TERMS OF THIS AGREEMENT INCLUDING BUT NOT LIMITED TO PARAGRAPH 14 OF THIS AGREEMENT. If it is necessary for Creditor to proceed legally to enforce this guaranty, Guarantor agrees to pay all costs, including attorneys' fees incurred in enforcement of this guaranty. It is not necessary for Creditor to proceed first against the Debtor before enforcing this guaranty. By signing this guaranty, the Guarantor authorizes Creditor to obtain personal credit bureau reports for credit and collection purposes.

GUARANTOR NAME (no title): Keneth Flag SIGNATURE: X

Scanned with CamScanner

1. **FINANCE AGREEMENT.** Subject to the terms of this Agreement signed by Creditor and Debtor, Debtor has requested that Creditor provide financing to enable Debtor to purchase the equipment described above (such personal property, hardware, software, services and any upgrades, replacements, repairs and additions referred to as "Equipment") which Debtor will use for business purposes only. Debtor hereby grants Creditor a first priority, purchase money security interest in the Equipment and its proceeds to secure Debtor's obligations hereunder and under all other agreements with Creditor (collectively "Other Agreements"), so long as but only to the extent that Creditor (or if this Agreement is assigned to another party, then such assignee) is the lessor, lender secured party or other similar party under such Other Agreements. Debtor agrees to all of the terms and conditions contained in this Agreement, which together are a complete statement of Creditor and Debtor's agreement regarding the Equipment.

2. **PAYMENTS.** Debtor will pay the documentation fee and any advance payments on the date Debtor delivers this Agreement. The "Acceptance Date" is the date on which Debtor verbally accepts this Agreement. The "Commencement Date" will be the Acceptance Date and the Payments will begin on the first day of the payment period following the Commencement Date and shall continue thereafter to be paid on the same day of each subsequent month or other calendar period and for the time period specified in this Agreement. Charges from the Commencement Date to the date the Payments begin shall be computed by prorating the Payment to a daily rate based on a 30 day month. Debtor will make all Payments required under this Agreement at such address as Creditor may specify in writing. Creditor shall satisfy Debtor's payment obligations to Supplier as defined herein related to the Products and Services and thereafter Debtor shall pay to Creditor the Payments and other charges, commencing as of the Commencement Date, and continuing thereafter as specified in this Agreement. Debtor acknowledges and agrees Creditor may receive an undisclosed discount, credit or rebate from Supplier which shall be solely for Creditor's account and benefit and shall not accrue to Debtor in any manner whatsoever. If the cost of the Products varies from the estimate Debtor or Supplier have provided to Creditor, Debtor agrees Creditor may adjust the payment accordingly upward or downward up to 10%. If for any reason, Debtor's check or automatic payment request is returned due to insufficient funds or a stop payment, a $50.00 fee will be assessed. Creditor may impose a late charge of 10% of any past-due payment or other sums due hereunder and may, in addition, charge interest on the unpaid amount at eighteen percent (18%) per annum, or, if less, the maximum rate permitted by applicable law.

3. **PREPAYMENT.** Upon prior written consent of Creditor (which consent shall not be unreasonably withheld, conditioned or delayed), Debtor may prepay in whole (but not in part) the entire indebtedness due hereunder by paying the sum of the following: any accrued and unpaid Payments and other amounts then due under this Agreement, plus accrued late charges and interest thereon; plus the aggregate of all Payments not yet due and payable hereunder discounted to present value at 2%.

4. **NON-CANCELLABLE.** THIS IS A NON-CANCELLABLE AGREEMENT AND MAY NOT BE CANCELLED BY DEBTOR FOR ANY REASON WHATSOEVER. DEBTOR WILL MAKE ALL PAYMENTS WHETHER OR NOT IT IS SATISFIED WITH THE EQUIPMENT AND WITHOUT DEDUCTION FOR ANY CLAIM DEBTOR MAY HAVE AGAINST THE SUPPLIER OF THE EQUIPMENT OR AGAINST CREDITOR.

5. **WARRANTY DISCLAIMER.** CREDITOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR THAT THE EQUIPMENT IS MERCHANTABLE. DEBTOR AGREES THAT IS HAS SELECTED THE SUPPLIER AND EACH ITEM OF EQUIPMENT BASED UPON ITS OWN JUDGMENT AND DISCLAIM ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY CREDITOR. CREDITOR DOES NOT TAKE RESPONSIBILITY FOR THE INSTALLATION OR PERFORMANCE OF THE EQUIPMENT. THE SUPPLIER IS NOT AN AGENT OF CREDITOR AND NOTHING THE SUPPLIER STATES CAN AFFECT DEBTOR'S OBLIGATION UNDER THIS AGREEMENT. DEBTOR WILL CONTINUE TO MAKE ALL PAYMENTS UNDER THIS AGREEMENT REGARDLESS OF ANY CLAIM OR COMPLAINT AGAINST SUPPLIER.

6. **LOCATION OF EQUIPMENT/INSPECTION.** Debtor is the owner of the Equipment and agrees to keep the Equipment free and clear of all liens and encumbrances and use only at Debtor's address shown above and Debtor agrees not to move it unless Creditor agrees to it in advance in writing. Creditor may inspect the Equipment at any time during normal business hours.

7. **LOSS OR DAMAGE.** Debtor will bear all risk of loss, theft, damage and destruction to any item of Equipment. No such loss or damage relieves Debtor from the payment obligations under this Agreement. Debtor agrees to promptly notify Creditor in writing of any loss or damage and shall thereafter place the item of Equipment in good repair, condition and working order; provided however, that if such item of Equipment is determined by Creditor to be lost, stolen, destroyed or damaged beyond repair or is requisitioned or suffers a constructive total loss under an insurance policy carried hereunder, Debtor shall pay Creditor an amount equal to any accrued and unpaid Payments and other amounts then due under this Agreement, plus accrued late charges and interest thereon; plus the aggregate of all Payments not yet due and payable hereunder discounted to present value at 2% per year.

8. **COLLATERAL PROTECTION AND INSURANCE.** Debtor agrees to keep each item of Equipment fully insured against loss, naming Creditor as loss payee, in an amount requested by Creditor but in any event in an amount no less than the replacement cost of the Equipment until this Agreement is terminated as to such item. Any proceeds of insurance will be paid to Creditor and credited against the outstanding balance due under this Agreement. Debtor agrees to provide Creditor certificates or other evidence of insurance acceptable to Creditor, before this Agreement begins or, should Debtor fail to provide Creditor with evidence of insurance required hereby, Creditor shall have the right, but not be obligated, to obtain insurance covering Creditor's interest in the Equipment. In that event, Debtor shall reimburse Creditor on demand for the cost thereof, including, without limitation, Creditor's fees for services in placing and maintaining such insurance, on which we may earn a profit. Debtor shall maintain the Equipment is good repair, condition and working order, ordinary wear and tear excepted. Debtor will use the Equipment only as permitted by law and such insurance.

9. **INDEMNITY.** Creditor is not responsible for any loss or injuries caused by the installation or use of the Equipment. Debtor agrees to indemnify and hold harmless Creditor, its successors and assigns, employees, officers, directors and agents from and against any and all claims and suits for any loss, damage or injury sustained by any person whatsoever by reason of the sale, financing, use, possession or disposition of the Equipment and, in connection therewith, Debtor shall pay the costs of all reasonable legal fees and all other reasonable expenses incurred by Creditor, its successors and assigns.

10. **TAXES, FEES AND TITLING.** Debtor agrees to pay when due all taxes, fees including registrations, fines, penalties and other governmental assessments relating to this Agreement or the Equipment. If Creditor pays any of the above for Debtor, Debtor agrees to reimburse Creditor and to pay Creditor a processing fee for each payment Creditor makes on Debtor's behalf. Debtor also agrees to pay Creditor any filing fees prescribed by the Uniform Commercial Code and reimburse Creditor for all costs and expenses involved in documenting and servicing this Agreement. If requested by Creditor, Debtor shall cause an item of Equipment subject to title registration laws to be titled as directed by Creditor. Debtor shall advise Creditor as to any necessary retitling.

Initials:

Scanned with CamScanner

**11. ASSIGNMENT.** DEBTOR HAS NO RIGHT TO SELL, TRANSFER, ASSIGN OR SUBLEASE THE EQUIPMENT OR THIS AGREEMENT. Debtor understands that Creditor, without prior notice, has the right to assign this Agreement to another financing source without Debtor's consent. Debtor understands that the assignee will have the same rights and benefits but they do not have to perform any of Creditor's obligations. Debtor agrees that the rights of assignee will not be subject to any claims, defenses, or setoffs that Debtor may have against Creditor.

**12. DEFAULT AND REMEDIES.** Any of the following constitutes an event of default hereunder: (a) Debtor's failure to pay any amount due hereunder, within five (5) business days of when due; (b) Debtor's default in performing any other obligation hereunder or under any other agreement between Debtor and Creditor; (c) any representations or warranties by Debtor set forth in or made in connection with this Agreement shall prove materially false or misleading; (d) death or judicial declaration of incompetency of Debtor or a Guarantor, if an individual or partner; (e) the filing by or against Debtor or Guarantor of a petition under the Bankruptcy Code or under insolvency law or law providing for the relief of debtors, including without limitation, a petition for reorganization, agreement or extension; (f) the making of an assignment of a substantial portion of its assets by Debtor for the benefit of creditors, appointment of a receiver or trustee for Debtor or for any of Debtor's assets. If Debtor is in default under this Agreement, then Creditor, at its sole election, shall have the right to exercise any or all of the following with or without notice: (i) declare immediately due and payable the entire amount of all of Debtor's obligations hereunder, without setoff; (ii) take possession of and, if deemed appropriate, render unusable any or all items of Equipment, wherever located, without process of law and without liability for any damages occasioned by such taking of possession including damages to Debtor's property; (iii) require Debtor to assemble any or all items of Equipment at a location in reasonable proximity to their designated location hereunder; (iv) sell or otherwise dispose of any items of Equipment in a commercially reasonable manner at public or private sale. The proceeds of sale, lease or other disposition shall first be applied to all costs and expenses incurred in taking, removing, holding, repairing and selling or otherwise disposing of the Equipment, attorneys fees and court costs. Debtor will be obligated to pay any deficiency remaining after such application of proceeds. Creditor may recover interest on any unpaid balance at the rate of eighteen percent (18%) per annum. Creditor may also exercise any of the remedies available to it under Article 9 of the Uniform Commercial Code as enacted in the State of Illinois or under any other law or in equity. All remedies are cumulative. Debtor agrees that any delay or failure by Creditor to enforce its rights under this Agreement does not prevent Creditor from enforcing any rights at a later time, and the exercise of any remedy shall not prevent the exercise of any other remedy.

**13. UCC FILINGS.** Debtor authorizes Creditor to record such financing statements, title certificates and instruments as Creditor deems necessary to perfect and protect its security interest, without Debtor's signature, and if such signature is needed, Debtor appoints Creditor as Debtor's attorney-in-fact to sign such items in Debtor's name. As additional security, in any jurisdiction where the Uniform Commercial Code is in effect, you grant to us a security interest in all the property you own or acquire, including any goods, chattel paper, equipment, accounts, deposit accounts, instruments, contract rights and general intangibles, wherever located as well as any related proceeds. Debtor agrees to take any other action Creditor requests to protect Creditor's rights under this Agreement from time to time and that Creditor may record a copy of this Agreement as a financing statement. Debtor will provide any landlord or mortgagee waiver Creditor requests to protect Creditor's interest in the Equipment. Debtor authorizes Creditor to endorse Debtor's name to any notes, checks, or other instruments for the payment of money relating to the Equipment (including insurance).

**14. LAW AND JURISDICTION.** THIS AGREEMENT WILL BE DEEMED FULLY EXECUTED AND PERFORMED IN ILLINOIS OR THE HOME STATE OF CREDITOR'S ASSIGNEE AS IT MAY BE ASSIGNED FROM TIME TO TIME PER PARAGRAPH 11. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF ILLINOIS. DEBTOR EXPRESSLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION AND VENUE OF ANY COURT IN LAKE COUNTY, ILLINOIS OR ASSIGNEE'S HOME STATE AND WAIVES RIGHT TO TRIAL BY JURY FOR ANY CLAIM OR ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EQUIPMENT. FURTHERMORE, DEBTOR WAIVES THE DEFENSE OF INCONVENIENT FORUM.

**15. MISCELLANEOUS.** If any interest payment hereunder exceeds the highest amount allowed by law, it shall be reduced to such rate and the excess interest refunded to Debtor. In such event, Debtor agrees Creditor will not be subject to any penalties provided by law for collecting or charging interest in excess of lawful rates. This Agreement may be modified only by written agreement and not by course of performance. This Agreement becomes valid upon execution by Creditor and will begin on the Commencement Date and for the number of consecutive months shown above. All notices shall be given in writing by the party sending the notice and shall be effective when mailed by certified or registered mail addressed to the party receiving the notice at its address shown on the front of this Agreement (or to any other address specified by that party in writing) with postage prepaid. If any provision of this Agreement is declared unenforceable, the other provisions shall remain in full force and effect. This Agreement constitutes the entire agreement of the parties as to the subject matter and shall not be amended, altered or changed except by a written agreement signed by the parties.

**16. TRANSMITTAL.** Creditor and Debtor agree a scanned copy, photocopy or facsimile copy of this Agreement, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original of the documents and "best evidence" of the parties' agreement, and shall be binding on Debtor as if it were manually signed and personally delivered. Debtor agrees the document will be admissible in any legal action. To the extent this Agreement constitutes chattel paper under the UCC, a security interest in this Agreement may be created through the transfer and possession of a copy of this Agreement executed by Creditor without the need to transfer possession of any other copy of this Agreement, or any other related documents or instruments. Creditor has no duty to verify or inquire as to the validity, execution, signer's authority or any other matter concerning the propriety of any copy.

ACCEPTANCE: BY SIGNING THIS AGREEMENT: (I) YOU ACKNOWLEDGE YOU HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS ON ALL PAGES OF THIS AGREEMENT (II) YOU AGREE YOU CANNOT TERMINATE OR CANCEL THIS AGREEMENT, YOU HAVE AN UNCONDITIONAL OBLIGATION TO MAKE ALL PAYMENTS DUE UNDER THIS AGREEMENT, AND YOU CANNOT WITHHOLD, SET OFF OR REDUCE SUCH PAYMENTS FOR ANY REASON. You agree a scanned copy, photocopy or facsimile copy of this Agreement, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original.

Creditor: BFG Corporation dba Byline Financial Group

Signature: _____

Name: _____Amei Fisher_____

Title: _____AVP_____

Date: _____7/6/23_____

Debtor: Ken's Pizza Corner, LLC

Signature: _____

Name: Keneth Flag

Title: Owner

Date: 6-29-23

11-ANA/0221


**Byline Financial Group**

2801 Lakeside Drive, Suite 212
Bannockburn, IL 60015
Toll Free Phone (877) 497-2811 Fax (847) 283-7260

# EXHIBIT A

AGREEMENT NO. 78938
DEBTOR: Ken's Pizza Corner, LLC

The items set forth herein are incorporated into the Equipment Information section of the above referenced Agreement:

| Quantity | Description |
|---|---|
| 4 | Elo PayPoint Plus E464529 Android 8.1 with Google Play Services, 15.6-Inch, PCAP, 3GB RAM, 32GB SSD (6 Express Software License |
| 4 | 12.4-inch 512 MB Android Samsung Tablet S8 |
| 4 | Epson Thermal C31CE94061 , |
| 4 | PAX S300 EMV Microchip Reader EPX (Encryption and programing included) |
| 4 | 4 Feet Tall Self-order Digital Kiosk, 10 PCAP Display, Android 7.1 OS - White. |
| 2 | KDS Kitchen Monitors 42" touch Screen |
|  | Implementation, Installation |

Customer agrees a scanned copy, photocopy or facsimile copy of this Exhibit A, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original.

IN WITNESS WHEREOF, the parties hereto, by their authorized signatories, have executed this document at the date set forth below their respective signatures.

| Byline Financial Group | | DEBTOR: Ken's Pizza Corner, LLC | |
|---|---|---|---|
| Signature: | *CMydma* | Signature: | |
| Name: | *Amy Fisher* | Name: | Keneth Flag |
| Title: | *AVP* | Title: | OWNER |
| Date: | *7/6/23* | Date: | 6-28-23 |

*Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation*

13AEXA0223

Scanned with CamScanner

# Exhibit 7

# JE MEDIACORP

21 Goodway Dr Rochester NY 14623

# INVOICE

Date: 7/12/2023
INVOICE #:230717

**BILL TO:** NICKS IMPORT INC
1098 CHILI CENTER-COLD WATER RD
ROCHESTER NY 14624

| Quantity | Description | Total |
|:---:|:---|:---|
| 4 | Elo PayPoint Plus E464529 Android 8.1 with Google Play Services, 15.6-Inch, PCAP, 3GB RAM, 32GB SSD (6 Express Software License AD-8168-144/AD-5328-428/AD-3454-100 AD-3262-229 | $11,400.00 |
| 4 | 12.4-Inch 512 MB Android Samsung Tablet S8 283-429-563/290-334-013/292-178-256/267-200-481 | $ 3,200.00 |
| 4 | Epson Thermal C31CE94061 , EP-918901/EP-623800/EP-538001/EP-438829 | $ 1,600.00 . |
| 4 | PAX S300 EMV Microchip Reader EPX (Encryption and programing included) PAX-59402/PAX-537300/PAX-342720/PAX-434839 | $ 2,400.00 |
| 4 | 4 Feet Tall Self-order Digital Kiosk, 10 PCAP Display, Android 7.1 OS - White. KS-4282-728/KS-7235-537/KS-3272-825/KS-4281-532 | $12,800.00 |
| 2 | KDS Kitchen Monitors 42" touch Screen KDS-6282-517/KDS-6383-140/KDS-5280-527 /KDS-5282-627 | $ 5,600.00 |
| | Implementation, Installation | $ 2,000.00 |
| | SHIP TO: NICKS IMPORT INC 1098 CHILI CENTER-COLD WATER RD ROCHESTER NY 14624 | |

SUBTOTAL. **$39,000.00**
TAX **$ 3,120.00**
TOTAL. **$ 42,120.00**

Thank you for your business!

# Exhibit 8

DocuSign Envelope ID: 48A6AB03-6903-42F3-9FAF-F49D3B2C05D7

The Authoritative Copy of this record is held at NA3.docusign.net

 Byline Financial Group

## Equipment Finance Agreement

**Full Legal Name of Creditor:**
BFG Corporation dba Byline Financial Group
2801 Lakeside Drive, Suite 212
Bannockburn, IL 60015

**Agreement Number: 79247**

### Debtor Information

| |
|---|
| **Full Legal Name of Debtor: Nick's Imports Inc.** |
| **Address: 1098 Chili Center Coldwater Rd  Rochester, New York 14624** |
| **Phone:** |
| **Billing Address: 1098 Chili Center Coldwater Rd Rochester, NY 14624** |
| **Equipment Location: 1098 Chili Center Coldwater Rd  Rochester, NY 14624** |

### Name and Address of Supplier(s)

| Supplier Name | Address | City | State | Zip | Phone |
|---|---|---|---|---|---|
| J&E Business Consulting LLC dba J&E Media Corp 14623 | 21 Goodway Dr, #5B | Rochester, | | NY | |

### Equipment

| |
|---|
| **Serial Number     Equipment Description** |
| **Product more fully described per Exhibit attached** |

### Payment Terms

**Original Cost of Equipment:  $42,120.00**

| Payment Terms | Payment Amount | One time documentation and UCC filing fee | Advance Payments |
|---|---|---|---|
| Terms in months from Commencement Date:  48  Payment Period:  **Monthly** | 48   payments   of  $ 1035.73 | $149.00 | $1,035.73 |

**THIS EQUIPMENT FINANCE AGREEMENT (THIS "AGREEMENT") CONTAINS PROVISIONS SET FORTH BELOW AND ON ALL PAGES OF THIS AGREEMENT, ALL OF WHICH ARE MADE PART OF THIS AGREEMENT.**

As additional inducement for Creditor to enter into this Agreement, the undersigned (individually and collectively referred to herein as "Guarantor") unconditionally personally guarantees Creditor, it successors and assigns, the full and prompt payment and performance of all present and future obligations under this Agreement. Guarantor agrees that Creditor, without consent and agreement from any guarantor, may make other arrangements including compromise or settlement with the Debtor named above.  The Guarantor waives all defenses and notice of those changes and will remain responsible for the payment and obligations of this Agreement. Creditor does not have to notify Guarantor if the Debtor is in default. If the Debtor defaults, Guarantor will immediately pay in accordance with the default provision of this Agreement all sums due under the terms of this Agreement and will perform all the obligations of the Debtor under this Agreement. THIS GUARANTY IS SUBJECT TO AND INCORPORATES ALL TERMS OF THIS AGREEMENT INCLUDING BUT NOT LIMITED TO PARAGRAPH 14 OF THIS AGREEMENT. If it is necessary for Creditor to proceed legally to enforce this guaranty, Guarantor agrees to pay all costs, including attorneys' fees incurred in enforcement of this guaranty. It is not necessary for Creditor to proceed first against the Debtor before enforcing this guaranty. By signing this guaranty, the Guarantor authorizes Creditor to obtain personal credit bureau reports for credit and collection purposes.

GUARANTOR NAME (no title): Nicolo Bellone      SIGNATURE: X

DocuSigned by:
*Nicolo Bellone*
8D74F39BA804499...

DEFANA0223

DocuSign Envelope ID: 48A6AB03-6903-42F3-9FAF-F49D3B2C05D7
The Authoritative Copy of this record is held at NA3.docusign.net

1. **FINANCE AGREEMENT.** Subject to the terms of this Agreement signed by Creditor and Debtor, Debtor has requested that Creditor provide financing to enable Debtor to purchase the equipment described above (such personal property, hardware, software, services and any upgrades, replacements, repairs and additions referred to as "Equipment") which Debtor will use for business purposes only. Debtor hereby grants Creditor a first priority, purchase money security interest in the Equipment and its proceeds to secure Debtor's obligations hereunder and under all other agreements with Creditor (collectively "Other Agreements"), so long as but only to the extent that Creditor (or if this Agreement is assigned to another party, then such assignee) is the lessor, lender secured party or other similar party under such Other Agreements. Debtor agrees to all of the terms and conditions contained in this Agreement, which together are a complete statement of Creditor and Debtor's agreement regarding the Equipment.

2. **PAYMENTS.** Debtor will pay the documentation fee and any advance payments on the date Debtor delivers this Agreement. The "Acceptance Date" is the date on which Debtor verbally accepts this Agreement. The "Commencement Date" will be the Acceptance Date and the Payments will begin on the first day of the payment period following the Commencement Date and shall continue thereafter to be paid on the same day of each subsequent month or other calendar period and for the time period specified in this Agreement. Charges from the Commencement Date to the date the Payments begin shall be computed by converting the Payment to a daily rate based on a 30 day month. Debtor will make all Payments required under this Agreement at such address as Creditor may specify in writing. Creditor shall satisfy Debtor's payment obligations to Supplier as defined herein related to the Products and Services and thereafter Debtor shall pay to Creditor the Payments and other charges, commencing as of the Commencement Date, and continuing thereafter as specified in this Agreement. Debtor acknowledges and agrees Creditor may receive an undisclosed discount, credit or rebate from Supplier which shall be solely for Creditor's account and benefit and shall not accrue to Debtor in any manner whatsoever. If the cost of the Products varies from the estimate Debtor or Supplier have provided to Creditor, Debtor agrees Creditor may adjust the payment accordingly upward or downward up to 10%. If for any reason, Debtor's check or automatic payment request is returned due to insufficient funds or a stop payment, a $50.00 fee will be assessed. Creditor may impose a late charge of 10% of any past-due payment or other sums due hereunder and may, in addition, charge interest on the unpaid amount at eighteen percent (18%) per annum, or, if less, the maximum rate permitted by applicable law.

3. **PREPAYMENT.** Upon prior written consent of Creditor (which consent shall not be unreasonably withheld, conditioned or delayed), Debtor may prepay in whole (but not in part) the entire indebtedness due hereunder by paying the sum of the following: any accrued and unpaid Payments and other amounts then due under this Agreement, plus accrued late charges and interest thereon; plus the aggregate of all Payments not yet due and payable hereunder discounted to present value at 2%.

4. **NON-CANCELLABLE.** THIS IS A NON-CANCELLABLE AGREEMENT AND MAY NOT BE CANCELLED BY DEBTOR FOR ANY REASON WHATSOEVER. DEBTOR WILL MAKE ALL PAYMENTS WHETHER OR NOT IT IS SATISFIED WITH THE EQUIPMENT AND WITHOUT DEDUCTION FOR ANY CLAIM DEBTOR MAY HAVE AGAINST THE SUPPLIER OF THE EQUIPMENT OR AGAINST CREDITOR.

5. **WARRANTY DISCLAIMER.** CREDITOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR THAT THE EQUIPMENT IS MERCHANTABLE. DEBTOR AGREES THAT IS HAS SELECTED THE SUPPLIER AND EACH ITEM OF EQUIPMENT BASED UPON ITS OWN JUDGMENT AND DISCLAIM ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY CREDITOR. CREDITOR DOES NOT TAKE RESPONSIBILITY FOR THE INSTALLATION OR PERFORMANCE OF THE EQUIPMENT. THE SUPPLIER IS NOT AN AGENT OF CREDITOR AND NOTHING THE SUPPLIER STATES CAN AFFECT DEBTOR'S OBLIGATION UNDER THIS AGREEMENT. DEBTOR WILL CONTINUE TO MAKE ALL PAYMENTS UNDER THIS AGREEMENT REGARDLESS OF ANY CLAIM OR COMPLAINT AGAINST SUPPLIER.

6. **LOCATION OF EQUIPMENT/INSPECTION.** Debtor is the owner of the Equipment and agrees to keep the Equipment free and clear of all liens and encumbrances and use only at Debtor's address shown above and Debtor agrees not to move it unless Creditor agrees to it in advance in writing. Creditor may inspect the Equipment at any time during normal business hours.

7. **LOSS OR DAMAGE.** Debtor will bear all risk of loss, theft, damage and destruction to any item of Equipment. No such loss or damage relieves Debtor from the payment obligations under this Agreement. Debtor agrees to promptly notify Creditor in writing of any loss or damage and shall thereafter place the item of Equipment in good repair, condition and working order; provided however, that if such item of Equipment is determined by Creditor to be lost, stolen, destroyed or damaged beyond repair or is requisitioned or suffers a constructive total loss under an insurance policy carried hereunder, Debtor shall pay Creditor an amount equal to any accrued and unpaid Payments and other amounts then due under this Agreement, plus accrued late charges and interest thereon; plus the aggregate of all Payments not yet due and payable hereunder discounted to present value at 2% per year.

8. **COLLATERAL PROTECTION AND INSURANCE.** Debtor agrees to keep each item of Equipment fully insured against loss, naming Creditor as loss payee, in an amount requested by Creditor but in any event in an amount no less than the replacement cost of the Equipment until this Agreement is terminated as to such item. Any proceeds of insurance will be paid to Creditor and credited against the outstanding balance due under this Agreement. Debtor agrees to provide Creditor certificates or other evidence of insurance acceptable to Creditor, before this Agreement begins or, should Debtor fail to provide Creditor with evidence of insurance required hereby, Creditor shall have the right, but not be obligated, to obtain insurance covering Creditor's interest in the Equipment. In that event, Debtor shall reimburse Creditor on demand for the cost thereof, including, without limitation, Creditor's fees for services in placing and maintaining such insurance, on which we may earn a profit. Debtor shall maintain the Equipment is good repair, condition and working order, ordinary wear and tear excepted. Debtor will use the Equipment only as permitted by law and such insurance.

9. **INDEMNITY.** Creditor is not responsible for any loss or injuries caused by the installation or use of the Equipment. Debtor agrees to indemnify and hold harmless Creditor, its successors and assigns, employees, officers, directors and agents from and against any and all claims and suits for any loss, damage or injury sustained by any person whatsoever by reason of the sale, financing, use, possession or disposition of the Equipment and, in connection therewith, Debtor shall pay the costs of all reasonable legal fees and all other reasonable expenses incurred by Creditor, its successors and assigns.

10. **TAXES, FEES AND TITLING.** Debtor agrees to pay when due all taxes, fees including registrations, fines, penalties and other governmental assessments relating to this Agreement or the Equipment. If Creditor pays any of the above for Debtor, Debtor agrees to reimburse Creditor and to pay Creditor a processing fee for each payment Creditor makes on Debtor's behalf. Debtor also agrees to pay Creditor any filing fees prescribed by the Uniform Commercial Code and reimburse Creditor for all costs and expenses involved in documenting and servicing this Agreement. If requested by Creditor, Debtor shall cause an item of Equipment subject to title registration laws to be titled as directed by Creditor. Debtor shall advise Creditor as to any necessary retitling.

11. **ASSIGNMENT.** DEBTOR HAS NO RIGHT TO SELL, TRANSFER, ASSIGN OR SUBLEASE THE EQUIPMENT OR THIS AGREEMENT. Debtor understands that Creditor, without prior notice, has the right to assign this Agreement to another financing source

Initials:

DocuSign Envelope ID: 48A6AB03-6903-42F3-9FAF-F49D3B2C05D7
The Authoritative Copy of this record is held at NA3.docusign.net

without Debtor's consent. Debtor understands that the assignee will have the same rights and benefits but they do not have to perform any of Creditor's obligations. Debtor agrees that the rights of assignee will not be subject to any claims, defenses, or setoffs that Debtor may have against Creditor.

**12. DEFAULT AND REMEDIES.** Any of the following constitutes an event of default hereunder: (a) Debtor's failure to pay any amount due hereunder, within five (5) business days of when due; (b) Debtor's default in performing any other obligation hereunder or under any other agreement between Debtor and Creditor; (c) any representations or warranties by Debtor set forth in or made in connection with this Agreement shall prove materially false or misleading; (d) death or judicial declaration of incompetency of Debtor or a Guarantor, if an individual or partner; (e) the filing by or against Debtor or Guarantor of a petition under the Bankruptcy Code or under insolvency law or law providing for the relief of debtors, including without limitation, a petition for reorganization, agreement or extension; (f) the making of an assignment of a substantial portion of its assets by Debtor for the benefit of creditors, appointment of a receiver or trustee for Debtor or for any of Debtor's assets. If Debtor is in default under this Agreement, then Creditor, at its sole election, shall have the right to exercise any or all of the following with or without notice: (i) declare immediately due and payable the entire amount of all of Debtor's obligations hereunder, without setoff; (ii) take possession of and, if deemed appropriate, render unusable any or all items of Equipment, wherever located, without process of law and without liability for any damages occasioned by such taking of possession including damages to Debtor's property; (iii) require Debtor to assemble any or all items of Equipment at a location in reasonable proximity to their designated location hereunder; (iv) sell or otherwise dispose of any items of Equipment in a commercially reasonable manner at public or private sale. The proceeds of sale, lease or other disposition shall first be applied to all costs and expenses incurred in taking, removing, holding, repairing and selling or otherwise disposing of the Equipment, attorneys fees and court costs. Debtor will be obligated to pay any deficiency remaining after such application of proceeds. Creditor may recover interest on any unpaid balance at the rate of eighteen percent (18%) per annum. Creditor may also exercise any of the remedies available to it under Article 9 of the Uniform Commercial Code as enacted in the State of Illinois or under any other law or in equity. All remedies are cumulative. Debtor agrees that any delay or failure by Creditor to enforce its rights under this Agreement does not prevent Creditor from enforcing any rights at a later time, and the exercise of any remedy shall not prevent the exercise of any other remedy.

**13. UCC FILINGS.** Debtor authorizes Creditor to record such financing statements, title certificates and instruments as Creditor deems necessary to perfect and protect its security interest, without Debtor's signature, and if such signature is needed, Debtor appoints Creditor as Debtor's attorney-in-fact to sign such items in Debtor's name. As additional security, in any jurisdiction where the Uniform Commercial Code is in effect, you grant to us a security interest in all the property you own or acquire, including any goods, chattel paper, equipment, accounts, deposit accounts, instruments, contract rights and general intangibles, wherever located as well as any related proceeds. Debtor agrees to take any other action Creditor requests to protect Creditor's rights under this Agreement from time to time and that Creditor may record a copy of this Agreement as a financing statement. Debtor will provide any landlord or mortgagee waiver Creditor requests to protect Creditor's interest in the Equipment. Debtor authorizes Creditor to endorse Debtor's name to any notes, checks, or other instruments for the payment of money relating to the Equipment (including insurance).

**14. LAW AND JURISDICTION. THIS AGREEMENT WILL BE DEEMED FULLY EXECUTED AND PERFORMED IN ILLINOIS OR THE HOME STATE OF CREDITOR'S ASSIGNEE AS IT MAY BE ASSIGNED FROM TIME TO TIME PER PARAGRAPH 11. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF ILLINOIS. DEBTOR EXPRESSLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION AND VENUE OF ANY COURT IN LAKE COUNTY, ILLINOIS OR ASSIGNEE'S HOME STATE AND WAIVES RIGHT TO TRIAL BY JURY FOR ANY CLAIM OR ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EQUIPMENT. FURTHERMORE, DEBTOR WAIVES THE DEFENSE OF INCONVENIENT FORUM.**

**15. MISCELLANEOUS.** If any interest payment hereunder exceeds the highest amount allowed by law, it shall be reduced to such rate and the excess interest refunded to Debtor. In such event, Debtor agrees Creditor will not be subject to any penalties provided by law for collecting or charging interest in excess of lawful rates. This Agreement may be modified only by written agreement and not by course of performance. This Agreement becomes valid upon execution by Creditor and will begin on the Commencement Date and for the number of consecutive months shown above. All notices shall be given in writing by the party sending the notice and shall be effective when mailed by certified or registered mail addressed to the party receiving the notice at its address shown on the front of this Agreement (or to any other address specified by that party in writing) with postage prepaid. If any provision of this Agreement is declared unenforceable, the other provisions shall remain in full force and effect. This Agreement constitutes the entire agreement of the parties as to the subject matter and shall not be amended, altered or changed except by a written agreement signed by the parties.

**16. TRANSMITTAL.** Creditor and Debtor agree a scanned copy, photocopy or facsimile copy of this Agreement, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original of the documents and "best evidence" of the parties' agreement, and shall be binding on Debtor as if it were manually signed and personally delivered. Debtor agrees the document will be admissible in any legal action. To the extent this Agreement constitutes chattel paper under the UCC, a security interest in this Agreement may be created through the transfer and possession of a copy of this Agreement executed by Creditor without the need to transfer possession of any other copy of this Agreement, or any other related documents or instruments. Creditor has no duty to verify or inquire as to the validity, execution, signer's authority or any other matter concerning the propriety of any copy.

ACCEPTANCE: BY SIGNING THIS AGREEMENT: (I) YOU ACKNOWLEDGE YOU HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS ON ALL PAGES OF THIS AGREEMENT (II) YOU AGREE YOU CANNOT TERMINATE OR CANCEL THIS AGREEMENT, YOU HAVE AN UNCONDITIONAL OBLIGATION TO MAKE ALL PAYMENTS DUE UNDER THIS AGREEMENT, AND YOU CANNOT WITHHOLD, SET OFF OR REDUCE SUCH PAYMENTS FOR ANY REASON. You agree a scanned copy, photocopy or facsimile copy of this Agreement, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original.

Creditor: BFG Corporation dba Byline Financial Group

Signature: *Amy Fisher*
— A3C1D3748948447

Name: Amy Fisher

Title: AVP

Date: 07/17/2023

Debtor: Nick's Imports Inc.

Signature: *Nicolo Bellone*
— 8D74F39BA804490

Name: NICOLO BELLONE

Title: OWNER

Date:

DEFANA0213

DocuSign Envelope ID: 48A6AB03-6903-42F3-9FAF-F49D3B2C05D7

This is a COPY

The Authoritative Copy of this record is held at NA3.docusign.net

 Byline Financial Group

Agreement Number: 79247

### INDIVIDUAL GUARANTY

In consideration of **Byline Financial Group** ("Byline") entering into Agreement Number 79247 (the "Agreement") with Nick's Imports Inc. ("Customer"), the undersigned guarantor ("Guarantor") hereby unconditionally and irrevocably guarantees to Byline or its assignee(s) the full and prompt payment and full performance by Customer of all obligations under the Agreement. Guarantor also agrees that Byline may make other arrangements with the Customer and Guarantor will still be responsible for those payments and other obligations. Guarantor consents to any modification, amendment or extension of the Agreement without releasing Guarantor's obligation under this Guaranty. If Customer defaults, Guarantor will immediately pay in accordance with the default provisions of the Agreement all sums due under the terms of the Agreement and will perform all other obligations of Customer under the Agreement. Guarantor hereby waives the right to require Byline to (a) proceed against Customer or any other guarantor, (b) proceed against or exhaust the Equipment or Collateral, or (c) pursue any other right or remedy for the benefit of Guarantor. Guarantor waives any defense arising by reason of any defense of the Customer or by reason of the cessation, from any cause whatsoever, of the liability of the Customer under the Agreement. Guarantor waives any and all demands for performance, notices of nonperformance or default, and notices of cancellation or forfeiture. Byline may apply all proceeds received from the Customer or others to such part of the Customer's indebtedness as Byline may deem appropriate without consulting Guarantor and without prejudice to or in any way limiting or lessening the liability of Guarantor under this Guaranty. In addition, the undersigned agrees to pay all reasonable expenses incurred by Byline as a result of Customer's default, including but not limited to equipment repair, replacement and shipping cost, attorney's fees and court costs.

The obligations of the undersigned are joint and several, and are independent of the obligation of Customer and a demand and/or separate action or actions may be brought against Guarantor, whether or not action is brought against the Customer or whether the Customer be joined in any action or actions, the liability of Guarantor hereunder being primary. Guarantor hereby waives the benefit of any suretyship defenses affecting its liability hereunder or the enforcement hereof.

**This Guaranty shall be deemed to have been made in Lake County, Illinois. In the event that any litigation or other legal proceeding shall arise under and or in connection with this Guaranty, such litigation or other proceeding shall be conducted in a state or federal court located within or for Lake County, Illinois. Furthermore, the undersigned hereby accepts and consents to jurisdiction and venue in any state or federal court located within or for Lake County, Illinois. Guarantor agrees not raise any objection concerning any inconvenience this may cause Guarantor. This Guaranty shall be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the State of Illinois. The undersigned expressly waives the right to trial by jury.** Guarantor agrees that a facsimile or electronic copy of this Guaranty, with facsimile or electronically transmitted signatures may be treated as an original and will be admissible as evidence of the Guaranty.

DocuSigned by:

*Nicolo Bellone*

6D74F39BA904499...
(Signature) (no titles)

Print Name: NICOLO BELLONE

Date: 7/14/2023

*Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation*

DPG0223

DocuSign Envelope ID: 48A6AB03-6903-42F3-9FAF-F49D3B2C05D7

The Authoritative Copy of this record is held at NA3.docusign.net

 Byline Financial Group

2801 Lakeside Drive, Suite 212
Bannockburn, IL 60015
Toll Free Phone **(877)** 497-2811  Fax **(847)** 283-7260

# EXHIBIT A

AGREEMENT NO. 79247
CUSTOMER: Nick's Imports Inc.

The items set forth herein are incorporated into the Equipment Information section of the above referenced Agreement:

| Quantity | Description |
|----------|-------------|
| 4 | **Elo PayPoint Plus E464529 Android 8.1 with Google Play Services, 15.6-Inch, PCAP, 3GB RAM, 32GB SSD (6 Express Software License** |
| 4 | **12.4-inch 512 MB Android Samsung Tablet S8** |
| 4 | **Epson Thermal C31CE94061** |
| 4 | **PAX S300 EMV Microchip Reader EPX (Encryption and programing included)** |
| 4 | **4 Feet Tall Self-order Digital Kiosk, 10 PCAP Display, Android 7.1 OS - White**. |
| 2 | **KDS Kitchen Monitors 42" touch Screen** |
|  | **Implementation, Installation** |

Customer agrees a scanned copy, photocopy or facsimile copy of this Exhibit A, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original.

IN WITNESS WHEREOF, the parties hereto, by their authorized signatories, have executed this document at the date set forth below their respective signatures.

Byline Financial Group

Signature: *Amy Fisher*
A3C1D3748949447

Name: Amy Fisher

Title: AVP

Date: 07/17/2023

CUSTOMER:
Nick's Imports Inc.

Signature: *Nicolo Bellone*
6D74F39BA804499

Name: Nicolo Bellone

Title:

Date: 7/14/2023

*Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation*

DEXA0023

# Exhibit 9

**J&E MEDIACOPR**
21 Goodway DR, Rochester, NY 14623

Date: 07/19/2023
**INVOICE #:230719**

**BILL TO: DEVEAUX PLAZA INC**
**2649 MAIN ST, NIAGARA FALLS NY 14305**

| Quantity | Description | Total |
|:---:|:---|:---|
| 4 | All in One Elo PayPoint Plus E464529 8.1 with Google Play , 15.6-Inch, PCAP, 3GB RAM, 32GB SSD, (software | $16,800.00 |
| | License included ) AD-3638-638/AD-5382-537 AD/ 6373-647/AD-5463-627 | |
| 4 | Samsung 10" Tablet 512 MB 283-748-627/437-646-839/647-672-773/536-626-637 | $ 3,200.00 |
| 4 | Epson Thermal Printers  EP-918617/EP-92633/ EP-53482/EP-53720 | $ 1,600.00 |
| 4 | PAX A920 EMV Microchip Reader PAX-59442/ PAX-73731/PAX-28210/PAX-43799 | $ 3,600.00 |
| 6 | 4' Tall self-checkout Kiosks digital touch screen with CC payment built in. | $18,000.00 |
| | KDS-6286-242/KDS-5272-877/KDS-4171-637/ KDS-5281-726/KDS-5311-538/KDS-3161-882 | |
| | Implementation and training Ship To: DEVEAUX PLAZA INC 2649 MAIN ST NIAGARA FALLS, 14305 | $ 2,000.00 |

**TOTAL INCLUDING TAXES.**     **$48,816.00**

Thank you for your business!

# Exhibit 10

 Byline Financial Group

**Equipment Finance Agreement**

**Full Legal Name of Creditor:**
BFG Corporation dba Byline Financial Group
2801 Lakeside Drive, Suite 212
Bannockburn, IL 60015

Agreement Number: 79430

### Debtor Information

**Full Legal Name of Debtor: Deveaux Plaza Inc**
 Address: 2649 Main St  Niagara Falls, New York 14305
Phone: (716) 576-8291
Billing Address: 2649 Main St Niagara Falls, NY 14305
Equipment Location: 2649 Main St  Niagara Falls, NY 14305

### Name and Address of Supplier(s)

| Supplier Name | Address | City | State | Zip | Phone |
|---|---|---|---|---|---|
| J&E Business Consulting LLC dba J&E Media Corp 14623 | 21 Goodway Dr, #5B | Rochester, | NY | | |

### Equipment

Serial Number    Equipment Description
 Equipment further described per Exhibit A attached

### Payment Terms

**Original Cost of Equipment: $48,816.00**

| Payment Terms | Payment Amount | One time documentation and UCC filing fee | Advance Payments |
|---|---|---|---|
| Terms in months from Commencement Date: 48 Payment Period: Monthly | 48   payments   of $ 1216.78 | $149.00 | $1,216.78 |

**THIS EQUIPMENT FINANCE AGREEMENT (THIS "AGREEMENT") CONTAINS PROVISIONS SET FORTH BELOW AND ON ALL PAGES OF THIS AGREEMENT, ALL OF WHICH ARE MADE PART OF THIS AGREEMENT.**

As additional inducement for Creditor to enter into this Agreement, the undersigned (individually and collectively referred to herein as "Guarantor") unconditionally personally guarantees Creditor, it successors and assigns, the full and prompt payment and performance of all present and future obligations under this Agreement. Guarantor agrees that Creditor, without consent and agreement from any guarantor, may make other arrangements including compromise or settlement with the Debtor named above. The Guarantor waives all defenses and notice of those changes and will remain responsible for the payment and obligations of this Agreement. Creditor does not have to notify Guarantor if the Debtor is in default. If the Debtor defaults, Guarantor will immediately pay in accordance with the default provision of this Agreement all sums due under the terms of this Agreement and will perform all the obligations of the Debtor under this Agreement. THIS GUARANTY IS SUBJECT TO AND INCORPORATES ALL TERMS OF THIS AGREEMENT INCLUDING BUT NOT LIMITED TO PARAGRAPH 14 OF THIS AGREEMENT. If it is necessary for Creditor to proceed legally to enforce this guaranty, Guarantor agrees to pay all costs, including attorneys' fees incurred in enforcement of this guaranty. It is not necessary for Creditor to proceed first against the Debtor before enforcing this guaranty. By signing this guaranty, the Guarantor authorizes Creditor to obtain personal credit bureau reports for credit and collection purposes.

GUARANTOR NAME (no title): Mohamed Muthana SIGNATURE:X _Mohamed Matthew_

GUARANTOR NAME (no title): SIGNATURE:_____

EFANA0223

Scanned with CamScanner

1. **FINANCE AGREEMENT.** Subject to the terms of this Agreement signed by Creditor and Debtor, Debtor has requested that Creditor provide financing to enable Debtor to purchase the equipment described above (such personal property, hardware, software, services and any upgrades, replacements, repairs and additions referred to as "Equipment") which Debtor will use for business purposes only. Debtor hereby grants Creditor a first priority, purchase money security interest in the Equipment and its proceeds to secure Debtor's obligations hereunder and under all other agreements with Creditor (collectively "Other Agreements"), so long as but only to the extent that Creditor (or if this Agreement is assigned to another party, then such assignee) is the lessor, lender secured party or other similar party under such Other Agreements. Debtor agrees to all of the terms and conditions contained in this Agreement, which together are a complete statement of Creditor and Debtor's agreement regarding the Equipment.

2. **PAYMENTS.** Debtor will pay the documentation fee and any advance payments on the date Debtor delivers this Agreement. The "Acceptance Date" is the date on which Debtor verbally accepts this Agreement. The "Commencement Date" will be the Acceptance Date and the Payments will begin on the first day of the payment period following the Commencement Date and shall continue thereafter to be paid on the same day of each subsequent month or other calendar period and for the time period specified in this Agreement. Charges from the Commencement Date to the date the Payments begin shall be computed by converting the Payment to a daily rate based on a 30 day month. Debtor will make all Payments required under this Agreement at such address as Creditor may specify in writing. Creditor shall satisfy Debtor's payment obligations to Supplier as defined herein related to the Products and Services and thereafter Debtor shall pay to Creditor the Payments and other charges, commencing as of the Commencement Date, and continuing thereafter as specified in this Agreement. Debtor acknowledges and agrees Creditor may receive an undisclosed discount, credit or rebate from Supplier which shall be solely for Creditor's account and benefit and shall not accrue to Debtor in any manner whatsoever. If the cost of the Products varies from the estimate Debtor or Supplier have provided to Creditor, Debtor agrees Creditor may adjust the payment accordingly upward or downward up to 10%. If for any reason, Debtor's check or automatic payment request is returned due to insufficient funds or a stop payment, a $50.00 fee will be assessed. Creditor may impose a late charge of 10% of any past-due payment or other sums due hereunder and may, in addition, charge interest on the unpaid amount at eighteen percent (18%) per annum, or, if less, the maximum rate permitted by applicable law.

3. **PREPAYMENT.** Upon prior written consent of Creditor (which consent shall not be unreasonably withheld, conditioned or delayed), Debtor may prepay in whole (but not in part) the entire indebtedness due hereunder by paying the sum of the following: any accrued and unpaid Payments and other amounts then due under this Agreement, plus accrued late charges and interest thereon; plus the aggregate of all Payments not yet due and payable hereunder discounted to present value at 2%.

4. **NON-CANCELLABLE.** THIS IS A NON-CANCELLABLE AGREEMENT AND MAY NOT BE CANCELLED BY DEBTOR FOR ANY REASON WHATSOEVER. DEBTOR WILL MAKE ALL PAYMENTS WHETHER OR NOT IT IS SATISFIED WITH THE EQUIPMENT AND WITHOUT DEDUCTION FOR ANY CLAIM DEBTOR MAY HAVE AGAINST THE SUPPLIER OF THE EQUIPMENT OR AGAINST CREDITOR.

5. **WARRANTY DISCLAIMER.** CREDITOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, CONCERNING THE EQUIPMENT, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR THAT THE EQUIPMENT IS MERCHANTABLE. DEBTOR AGREES THAT IS HAS SELECTED THE SUPPLIER AND EACH ITEM OF EQUIPMENT BASED UPON ITS OWN JUDGMENT AND DISCLAIM ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY CREDITOR. CREDITOR DOES NOT TAKE RESPONSIBILITY FOR THE INSTALLATION OR PERFORMANCE OF THE EQUIPMENT. THE SUPPLIER IS NOT AN AGENT OF CREDITOR AND NOTHING THE SUPPLIER STATES CAN AFFECT DEBTOR'S OBLIGATION UNDER THIS AGREEMENT. DEBTOR WILL CONTINUE TO MAKE ALL PAYMENTS UNDER THIS AGREEMENT REGARDLESS OF ANY CLAIM OR COMPLAINT AGAINST SUPPLIER.

6. **LOCATION OF EQUIPMENT/INSPECTION.** Debtor is the owner of the Equipment and agrees to keep the Equipment free and clear of all liens and encumbrances and use only at Debtor's address shown above and Debtor agrees not to move it unless Creditor agrees to it in advance in writing. Creditor may inspect the Equipment at any time during normal business hours.

7. **LOSS OR DAMAGE.** Debtor will bear all risk of loss, theft, damage and destruction to any item of Equipment. No such loss or damage relieves Debtor from the payment obligations under this Agreement. Debtor agrees to promptly notify Creditor in writing of any loss or damage and shall thereafter place the item of Equipment in good repair, condition and working order; provided however, that if such item of Equipment is determined by Creditor to be lost, stolen, destroyed or damaged beyond repair or is requisitioned or suffers a constructive total loss under an insurance policy carried hereunder, Debtor shall pay Creditor an amount equal to any accrued and unpaid Payments and other amounts then due under this Agreement, plus accrued late charges and interest thereon; plus the aggregate of all Payments not yet due and payable hereunder discounted to present value at 2% per year.

8. **COLLATERAL PROTECTION AND INSURANCE.** Debtor agrees to keep each item of Equipment fully insured against loss, naming Creditor as loss payee, in an amount requested by Creditor but in any event in an amount no less than the replacement cost of the Equipment until this Agreement is terminated as to such item. Any proceeds of insurance will be paid to Creditor and credited against the outstanding balance due under this Agreement. Debtor agrees to provide Creditor certificates or other evidence of insurance acceptable to Creditor, before this Agreement begins or, should Debtor fail to provide Creditor with evidence of insurance required hereby, Creditor shall have the right, but not be obligated, to obtain insurance covering Creditor's interest in the Equipment. In that event, Debtor shall reimburse Creditor on demand for the cost thereof, including, without limitation, Creditor's fees for services in placing and maintaining such insurance, on which we may earn a profit. Debtor shall maintain the Equipment is good repair, condition and working order, ordinary wear and tear excepted. Debtor will use the Equipment only as permitted by law and such insurance.

9. **INDEMNITY.** Creditor is not responsible for any loss or injuries caused by the installation or use of the Equipment. Debtor agrees to indemnify and hold harmless Creditor, its successors and assigns, employees, officers, directors and agents from and against any and all claims and suits for any loss, damage or injury sustained by any person whatsoever by reason of the sale, financing, use, possession or disposition of the Equipment and, in connection therewith, Debtor shall pay the costs of all reasonable legal fees and all other reasonable expenses incurred by Creditor, its successors and assigns.

10. **TAXES, FEES AND TITLING.** Debtor agrees to pay when due all taxes, fees including registrations, fines, penalties and other governmental assessments relating to this Agreement or the Equipment. If Creditor pays any of the above for Debtor, Debtor agrees to reimburse Creditor and to pay Creditor a processing fee for each payment Creditor makes on Debtor's behalf. Debtor also agrees to pay Creditor any filing fees prescribed by the Uniform Commercial Code and reimburse Creditor for all costs and expenses involved in documenting and servicing this Agreement. If requested by Creditor, Debtor shall cause an item of Equipment subject to title registration laws to be titled as directed by Creditor. Debtor shall advise Creditor as to any necessary retitling.

Initials: MM

EFANA0223

Scanned with CamScanner

**11. ASSIGNMENT.** DEBTOR HAS NO RIGHT TO SELL, TRANSFER, ASSIGN OR SUBLEASE THE EQUIPMENT OR THIS AGREEMENT. Debtor understands that Creditor, without prior notice, has the right to assign this Agreement to another financing source without Debtor's consent. Debtor understands that the assignee will have the same rights and benefits but they do not have to perform any of Creditor's obligations. Debtor agrees that the rights of assignee will not be subject to any claims, defenses, or setoffs that Debtor may have against Creditor.

**12. DEFAULT AND REMEDIES.** Any of the following constitutes an event of default hereunder: (a) Debtor's failure to pay any amount due hereunder, within five (5) business days of when due; (b) Debtor's default in performing any other obligation hereunder or under any other agreement between Debtor and Creditor; (c) any representations or warranties by Debtor set forth in or made in connection with this Agreement shall prove materially false or misleading; (d) death or judicial declaration of incompetence of Debtor or a Guarantor, if an individual or partner; (e) the filing by or against Debtor or Guarantor of a petition under the Bankruptcy Code or under insolvency law or law providing for the relief of debtors, including without limitation, a petition for reorganization, agreement or extension; (f) the making of an assignment of a substantial portion of its assets by Debtor for the benefit of creditors, appointment of a receiver or trustee for Debtor or for any of Debtor's assets. If Debtor is in default under this Agreement, then Creditor, at its sole election, shall have the right to exercise any or all of the following with or without notice: (i) declare immediately due and payable the entire amount of all of Debtor's obligations hereunder, without setoff; (ii) take possession of and, if deemed appropriate, render unusable any or all items of Equipment, wherever located, without process of law and without liability for any damages occasioned by such taking of possession including damages to Debtor's property; (iii) require Debtor to assemble any or all items of Equipment at a location in reasonable proximity to their designated location hereunder; (iv) sell or otherwise dispose of any items of Equipment in a commercially reasonable manner at public or private sale. The proceeds of sale, lease or other disposition shall first be applied to all costs and expenses incurred in taking, removing, holding, repairing and selling or otherwise disposing of the Equipment, attorneys fees and court costs. Debtor will be obligated to pay any deficiency remaining after such application of proceeds. Creditor may recover interest on any unpaid balance at the rate of eighteen percent (18%) per annum. Creditor may also exercise any of the remedies available to it under Article 9 of the Uniform Commercial Code as enacted in the State of Illinois or under any other law or in equity. All remedies are cumulative. Debtor agrees that any delay or failure by Creditor to enforce its rights under this Agreement does not prevent Creditor from enforcing any rights at a later time, and the exercise of any remedy shall not prevent the exercise of any other remedy.

**13. UCC FILINGS.** Debtor authorizes Creditor to record such financing statements, title certificates and instruments as Creditor deems necessary to perfect and protect its security interest, without Debtor's signature, and if such signature is needed, Debtor appoints Creditor as Debtor's attorney-in-fact to sign such items in Debtor's name. As additional security, in any jurisdiction where the Uniform Commercial Code is in effect, you grant to us a security interest in all the property you own or acquire, including any goods, chattel paper, equipment, accounts, deposit accounts, instruments, contract rights and general intangibles, wherever located as well as any related proceeds. Debtor agrees to take any other action Creditor requests to protect Creditor's rights under this Agreement from time to time and that Creditor may record a copy of this Agreement as a financing statement. Debtor will provide any landlord or mortgagee waiver Creditor requests to protect Creditor's interest in the Equipment. Debtor authorizes Creditor to endorse Debtor's name to any notes, checks, or other instruments for the payment of money relating to the Equipment (including insurance).

**14. LAW AND JURISDICTION.** THIS AGREEMENT WILL BE DEEMED FULLY EXECUTED AND PERFORMED IN ILLINOIS OR THE HOME STATE OF CREDITOR'S ASSIGNEE AS IT MAY BE ASSIGNED FROM TIME TO TIME PER PARAGRAPH 11. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF ILLINOIS. DEBTOR EXPRESSLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION AND VENUE OF ANY COURT IN LAKE COUNTY, ILLINOIS OR ASSIGNEE'S HOME STATE AND WAIVES RIGHT TO TRIAL BY JURY FOR ANY CLAIM OR ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EQUIPMENT. FURTHERMORE, DEBTOR WAIVES THE DEFENSE OF INCONVENIENT FORUM.

**15. MISCELLANEOUS.** If any interest payment hereunder exceeds the highest amount allowed by law, it shall be reduced to such rate and the excess interest refunded to Debtor. In such event, Debtor agrees Creditor will not be subject to any penalties provided by law for collecting or charging interest in excess of lawful rates. This Agreement may be modified only by written agreement and not by course of performance. This Agreement becomes valid upon execution by Creditor and will begin on the Commencement Date and for the number of consecutive months shown above. All notices shall be given in writing by the party sending the notice and shall be effective when mailed by certified or registered mail addressed to the party receiving the notice at its address shown on the front of this Agreement (or to any other address specified by that party in writing) with postage prepaid. If any provision of this Agreement is declared unenforceable, the other provisions shall remain in full force and effect. This Agreement constitutes the entire agreement of the parties as to the subject matter and shall not be amended, altered or changed except by a written agreement signed by the parties.

**16. TRANSMITTAL.** Creditor and Debtor agree a scanned copy, photocopy or facsimile copy of this Agreement, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original of the documents and "best evidence" of the parties' agreement, and shall be binding on Debtor as if it were manually signed and personally delivered. Debtor agrees the document will be admissible in any legal action. To the extent this Agreement constitutes chattel paper under the UCC, a security interest in this Agreement may be created through the transfer and possession of a copy of this Agreement executed by Creditor without the need to transfer possession of any other copy of this Agreement, or any other related documents or instruments. Creditor has no duty to verify or inquire as to the validity, execution, signer's authority or any other matter concerning the propriety of any copy.

ACCEPTANCE: BY SIGNING THIS AGREEMENT: (I) YOU ACKNOWLEDGE YOU HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS ON ALL PAGES OF THIS AGREEMENT (II) YOU AGREE YOU CANNOT TERMINATE OR CANCEL THIS AGREEMENT, YOU HAVE AN UNCONDITIONAL OBLIGATION TO MAKE ALL PAYMENTS DUE UNDER THIS AGREEMENT, AND YOU CANNOT WITHHOLD, SET OFF OR REDUCE SUCH PAYMENTS FOR ANY REASON. You agree a scanned copy, photocopy or facsimile copy of this Agreement, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original.

Creditor: BFG Corporation dba Byline Financial Group

Signature:

Name: Amy Fisher

Title: AVP

Date: 7/24/23

Debtor: Deveaux Plaza

Signature:

Name: Mohamed Muthana

Title: Owner

Date: 7-21-23

 Byline Financial Group

2801 Lakeside Drive, Suite 212
Bannockburn, IL 60015
Toll Free Phone (877) 497-2811  Fax (847) 283-7260

## EXHIBIT A

AGREEMENT NO. 79430
DEBTOR: Deveaux Plaza Inc

The items set forth herein are incorporated into the Equipment Information section of the above referenced Agreement:

| Quantity | Description |
|---|---|
| 4 | All in One Elo PayPoint Plus E464529 8.1 with Google Play , 15.6-Inch, PCAP, 3GB RAM, 32GB SSD, (software |
| | License included ) AD-3638-638/AD-5382-537 AD/ 6373-647/AD-5463-627 |
| 4 | Samsung 10" Tablet 512 MB 283-748-627/437-646-839/647-672-773/536-626-637 |
| 4 | Epson Thermal Printers EP-918617/EP-92633/ EP-53482/EP-53720 |
| 4 | PAX A920 EMV Microchip Reader PAX-59442/ PAX-73731/PAX-28210/PAX-43799 |
| 6 | 4' Tall self-checkout Kiosks digital touch screen with CC payment built in. |
| | KDS-6286-242/KDS-5272-877/KDS-4171-637/ KDS-5281-726/KDS-5311-538/KDS-3161-882 Implementation and training |

Customer agrees a scanned copy, photocopy or facsimile copy of this Exhibit A, with photocopied, facsimile or electronically transmitted signatures thereon, shall be deemed an original.

IN WITNESS WHEREOF, the parties hereto, by their authorized signatories, have executed this document at the date set forth below their respective signatures.

**Byline Financial Group**

Signature: _____

Name: _____

Title: _____

Date: _____

**DEBTOR:**
Deveaux Plaza Inc

Signature: _____

Name: _____Mohamed Muthana_____

Title: _____

Date: _____

*Byline Financial Group is the trade name for the commercial equipment leasing and finance business of Byline Bank and its subsidiary BFG Corporation*